793 F.Supp. 1457 (1990)
Curtiss COBB, et al., Plaintiffs,
v.
ANHEUSER BUSCH, INC., et al., Defendants.
No. 87-982C(1).
United States District Court, E.D. Missouri, E.D.
October 24, 1990.
*1458 *1459 *1460 Mary Anne Sedey, St. Louis, Mo., for plaintiffs.
Bryan, Cave, McPheeters & McRoberts, Vanessa L. Whiting, Dennis C. Donnelly, St. Louis, Mo., for defendant Anheuser-Busch.
Jerome Diekemper, Clayton, Mo., for defendant Local 1187.

MEMORANDUM
NANGLE, District Judge.
Plaintiffs Curtiss Cobb, Linda Landzettel, Loretta Weiner and Patricia Long brought the instant action against Anheuser-Busch, Inc., and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Bottlers Local Union No. 1187 ("Local 1187") alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. Specifically, plaintiffs, who are all females and bottlers in the Packaging Quality Assurance Department in Anheuser-Busch's St. Louis Brewery, alleged that Anheuser-Busch and Local 1187 discriminated against them on the basis of sex and ultimately retaliated against plaintiffs for filing charges of discrimination with the Equal Employment Opportunity Commission. This Court, in its order and memorandum of December 23, 1987, dismissed plaintiffs' claims against Local 1187 for failure to file timely charges of discrimination. The Court retained Local 1187 as a defendant in this action, however, for the limited purposes of interpreting the collective bargaining agreement and enabling the Court to fashion an effective remedy to prevent future discrimination should the facts justify such relief.
Pursuant to the parties' joint request for a bifurcated trial on the issues of liability and damages, the issue of Anheuser-Busch's liability was tried to this Court sitting without a jury in an eleven-day trial. This Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law. Fed.R.Civ.P. 52.

*1461 FINDINGS OF FACT
1. Plaintiffs Patricia Long, Loretta Weiner, Linda Landzettel and Curtiss Cobb are citizens of the United States of America and were all residents of the Eastern District of Missouri at the time that this action was filed. Plaintiffs are all females.
2. Defendant Anheuser-Busch, Inc. ("the Company") is a corporation existing under the laws of the State of Missouri and is an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.
3. Defendant Bottlers Local Union No. 1187 ("the Union" or "Local 1187") is a labor organization within the meaning of Title VII and a party to a current collective bargaining agreement with the Company. Local 1187 is the Collective Bargaining Agent for the plaintiffs, who are covered by the collective bargaining agreement between the Company and the Union. Local 1187 represents all bottlers at the St. Louis facility. The Union or its predecessor has represented the "bottlers" at the St. Louis facility for over four decades.

A. General Operations at the St. Louis Facility.

4. Plaintiffs are all bottlers in the Packaging Quality Assurance Department ("PQA") at the Anheuser-Busch Brewery in St. Louis, Missouri. PQA is a department within the Beer Packaging and Shipping Section of the St. Louis Brewery, which consists of: (1) Beer Packaging; (2) Warehousing and Shipping; (3) General Service Crafts; (4) Building Cleaning; and (5) PQA.
5. PQA is charged with testing certain characteristics of the beer as well as the containers holding the beer and the packaging in which it is shipped and marketed. Tests are performed during and after the packaging of the beer in bottles, cans and kegs, and are some of the last tests to be performed on the beer and its packaging before it is released for sale.
6. PQA is staffed with approximately 120 beer bottlers, which are referred to as "lab techs". It operates around the clock with four shifts: red, yellow, midnight and day. Two of the shifts, the red and yellow shifts, are "swing shifts". They operate two weeks on days (7:00 a.m. to 3:00 p.m.) and two weeks on afternoons (1:00 p.m. to 7:00 p.m. or 3:00 p.m. to 11:00 p.m.). The midnight shift operates from 11:00 p.m. to 7:00 a.m. The day shift operates from 8:00 a.m. to 4:00 p.m. As of December 13, 1988, 34 bottlers worked on the red shift, 24 on the yellow shift, 17 on the midnight shift and 14 on day shift.
7. Every bottler is paid an hourly wage of $17.29, receives 15 paid holidays, 6 paid sick days and between 2 and 9 weeks vacation each year, regardless of her job assignment.
8. Plaintiffs are assigned to the red shift, whose members may be assigned various tasks within PQA.
9. Plaintiff Patricia Long was employed by the Company on 8/13/73 as a bottler in the Bevo Plant. She transferred to PQA, yellow shift, on 9/5/77. Some time between 1980 and 1983 she transferred to red shift.
10. Plaintiff Loretta Weiner was employed by the Company on 7/24/76 as a bottler in the Bevo Plant and transferred to PQA on 9/18/78. She transferred to red shift from yellow shift in 1979.
11. Plaintiff Linda Landzettel was employed by the Company on 7/24/76 as a bottler in the Bevo Plant and transferred to PQA, red shift, on 7/31/78. She now works day shift.
12. Plaintiff Curtiss Cobb was employed by the Company on 7/24/76 as a bottler in the Bevo Plant. She was initially assigned to red shift and transferred to PQA on 9/18/78.
13. Lab techs in PQA may be assigned to nine different areas of PQA, which are often referred to as "labs", in the Bevo building: (1) Reprocessing and Repack on the warehouse floor of the Bevo building; (2) sixth floor bottle lab; (3) fifth floor can lab; (4) third floor bottle lab; (5) second floor can lab; (6) basement bottle lab; (7) draft beer in the basement of the draft beer building; (8) Material Testing on the *1462 fourth floor; and (9) Technical Services on the third floor.
14. Assignments to Material Testing and Technical Services are considered permanent, and lab techs who are permanently assigned to these labs work the day shift. The remaining assignments are handled by red, yellow and midnight shift.
15. The tasks in Reprocessing generally involve inspection. Cases of beer are examined for suspected defects that may have been detected in the various can and bottle labs, e.g., bad labels, loose crowns, leaking containers. Lab techs may be assigned to "table jobs", which require lab techs to lift cases of beer from pallets to roller conveyors, and then manually transport the cases along the rollers to tables. Lab techs then sit at these tables and inspect the bottles or cans of beer for glass, foreign matter, dents or leaks. Lab techs in Reprocessing also perform a task known as "sorting", which involves inspecting damaged pallets of cases of beer and separating beer that will be dumped and beer that will be salvaged. Salvaged beer is taken to a center aisle and transported to an area where pallets are repacked. In addition, lab techs may be assigned to drive fork trucks to aid in these various tasks or pull "randoms", which involves removing random samples of beer from cases or pallets to inspect for proper packaging, etc.
16. Lab techs generally consider Reprocessing to be an undesirable assignment, although one employee, Shirley Landzettel, has requested to be assigned to reprocessing on a permanent basis. The Reprocessing area is located adjacent to the open loading dock area in the Bevo building, which results in colder temperatures in the winter and hotter temperatures in the summer in Reprocessing than in other areas of PQA. In addition, many lab techs consider Reprocessing to be boring, heavy, tedious work that provides little mental challenge. Lab techs in reprocessing are subjected to greater supervision and scrutiny than lab techs assigned to other areas.
17. The various can, bottle and draft beer labs are generally referred to as "production labs". When working the production labs, lab techs generally pick up samples of cans or bottles and run tests on the amount of air in each container ("airs"), the level of carbonation ("CO2's"), and check for foreign matter ("turbidity"). Lab techs in the production labs also monitor the temperature of beer coming out of the pasteurizer, watch "beer changes" (when different product lines are dispensed into containers), and inspect the finished product in its final packaging to make sure that the right product is in the right container, labels are intact, the product is coded properly, etc. ("finish pack"). Basically, the same tests are run on draft beer.
18. Lab techs working in the production labs also perform tests known as PCAS and SVK. PCAS is a computer device that is placed in pasteurizers and records the temperature of the pasteurizer. SVK, which stands for "single valve keg", is a test performed on the draft beer products. SVK involves removing beer from the keg periodically, inspecting the keg, checking weights and checking the scales. These tests require the lab technicians to enter their test results on reports and enter the collective data from their reports onto a computer.
19. Production lab assignments are generally considered more desirable because the lab techs are subjected to less supervision. The tasks involve more mental activity and are more challenging than the tasks in reprocessing.
20. Only 4 lab techs work in Technical Services. Lab techs in Technical Services test cleaning materials, lubricants, etc., and perform more "experimental-type work". Tests are not routine, but, rather, are formulated to fit particular needs. Lab techs in this lab are required to exercise more judgment than in other labs. Many lab techs seek assignments to Technical Services because of the physical environment and the mentally challenging nature of the work.
21. Only 10 lab techs work in Material Testing. In Material Testing, any type of container that beer is placed in for shipping (cans, bottles, cases, cartons, separation of cartons) is tested before the beer is placed *1463 in the containers. Material Testing involves more routine tests than Technical Services, but lab techs frequently rotate to different jobs within the lab. Like Technical Services, many lab techs seek assignments to Material Testing because of the physical environment as well as the mentally challenging nature of the work.
22. In addition to the above-mentioned assignments, lab techs also serve as vacation relief for the Tower Lab. In addition, permanent assignments are given to lab techs who have served as vacation relief. The Tower Lab is part of the Brewing Quality Assurance Department ("BQA"), which is a department within the Brewing Operation rather than the Beer Packaging and Shipping Department. The Brewing Operation, BQA and the Tower Lab are geographically separate from Beer Packaging and Shipping, PQA and the labs in the Bevo building.
23. The Tower Lab is comprised of a main laboratory and two supplementary labs, all of which are located on the sixth floor in Building No. 36, approximately one block away from the Bevo building. Approximately 33 bottlers are assigned to the Tower Lab permanently. The majority of lab techs work from 8:00 a.m. to 4:00 p.m. Approximately 3 lab techs work from 4:00 p.m. to 12:00 a.m., and approximately 3 lab techs work from 12:00 a.m. to 8:00 a.m. Approximately 5 lab techs serve as vacation relief for permanent lab techs on leaves of absences, vacations and sick leave.
24. Lab techs assigned to the Tower Lab test beer in the brewing stage and before packaging. They inspect liquids, grains and all materials used in making the beer. Tests are run on beer in different stages of the brewing process. Lab techs may be assigned to different areas within the building and routinely pick up samples on different floors. Individuals with little experience or who are serving as vacation relief generally wash glassware and pick up beer until they become familiar with more sophisticated procedures. Many lab techs consider the Tower Lab to be even more challenging than Material Testing and Technical Services, and it is generally considered to be a desirable assignment.

B. The Supervisory Hierarchy.

25. William Ross is currently the Manager of PQA and in generally responsible for all operations and PQA and reports directly to the Plant Manager, Jack Russell. Don Kugler is the Assistant Manager for PQA; he reports to the Manager of PQA.
26. Joe Schiro has been the General Foreman for Packaging since July of 1983. The General Foreman for Packaging is responsible for scheduling manpower for all laboratory jobs, draft beer, reprocessing and repackaging, responding to wholesaler complaints and managing the testing on the bottle, can and draft beer units. Mr. Schiro is not directly responsible for Material Testing and Technical Services, as these labs have independent general foremen. He reports directly to the Manager and Assistant Manager of PQA. Prior to Joe Schiro, John Poore was the General Foreman for Packaging.
27. Mel Klock is presently the Technical Manager of Corporate Quality Assurance. He has held this position for the past five years. Prior to that, he was Assistant Manager of PQA for one year. Prior to that, he was General Foreman for Packaging from 1972 until 1982.
28. There are also Area Coordinators who are generally responsible for each shift. Area Coordinators report directly to the General Foreman of Packaging. Cletus Hinkamp was the Area Coordinator on the red shift from approximately 1982 until 1984/85. Since early 1985 Paul Parker has been the Area Coordinator on red shift. There is also a Relief Coordinator who fills in when the Area Coordinator assigned to a specific shift is absent.
29. There are also foremen (or "supervisors") who directly supervise lab techs in the different areas and labs within PQA on particular shifts. Foremen report directly to the area coordinator. There are also relief foremen/supervisors who fill in for foremen assigned to specific areas and shifts when said foremen are absent.
*1464 30. Each shift is represented by a union delegate or "Shop Steward". It is the responsibility of each shop steward to represent the concerns of the Union with respect to the employees on a given shift. Shop stewards are elected for two year terms by the employee members of Local 1187 working in a particular area of the Beer Packaging and Shipping Department. The Union pays these individuals $480.00 per year to serve as shop stewards.

C. The "Protected Group".

31. Prior to 1974 bottlers and lab technicians were in separate unions. Bottlers were in Local 1187, and lab technicians were in Local 227. During this period, lab technicians would rotate into reprocessing frequently, but they were not permitted to perform lifting of cases, etc., because this was the bottlers' territory.
32. In 1974 the bottlers and the lab technicians agreed to merge into a single union. Originally, only a small amount of technicians worked in the labs and bottlers constituted the primary work force in reprocessing. As the company began to increase its production and more units began to run, however, a need arose for the labs to expand. Also, in the past, different groups of bottlers were brought into reprocessing at different times on an "as needed" basis. Thus, there existed a lack of continuity of personnel who were familiar with the tasks in reprocessing. Therefore, the company decided that there should be more lab techs in Reprocessing and fewer bottlers, because lab technicians would know what was "good product" and might perform that area's quality control tasks more ably.
33. The merger began in 1974 and became official in 1976. In March of 1976, a strike occurred, which lasted fourteen weeks. After the strike, in 1977, the transfer system of new personnel into Packaging Quality Assurance began.
34. With the merger of these unions and the introduction of new lab technicians into Packaging Quality Assurance, however, there arose a concern that the 15-16 lab technicians on each shift who had extensive experience in the upper floor labs and who had "done their time" in Reprocessing would be supplanted by the new lab techs entering PQA. Among these new lab technicians were the first women that would be assigned to PQA as lab techs.
35. In response to these concerns, union officials and company officials met in 1976-77 and established the "Protected Group", which originally consisted of the 15-16 lab technicians on each shift who had the highest seniority and were members of old Local 227. The purpose of the Protected Group was to require the newer lab techs with low seniority to spend more time in Reprocessing than the "old timers", who had already spent a good deal of time in Reprocessing. Approximately two of the "old timers" were to, however, rotate to reprocessing each week for a one-week period. It was hoped that the existence of the Protected Group would keep the more senior technicians in the jobs they were familiar with, while the newer technicians would occasionally rotate to the upper floors and eventually learn those jobs too.
36. As members of the protected group left PQA, they were replaced by the lab tech with the highest seniority who had been trained on the upper floor jobs. Newer members of the Protected Group, however, were not chosen on the basis of seniority in PQA, but, rather, plant seniority. In fact, supervisors in PQA did not keep records of seniority within the department. In some instances, individuals with very high plant seniority would transfer into PQA, be trained by individuals with a great deal of experience in PQA, and within a very short time be admitted to the Protected Group based on their plant seniority. Thus, as new lab technicians entered the Protected Group, the original motives behind establishing the Group were gradually defeated.
37. Pat Long transferred into PQA in 1977 and initially worked on the yellow shift. When she transferred to the red shift (between 1980 and 1983), she was admitted to the Protected Group.
38. In February of 1984, Pat Long circulated a petition requesting the abolition of the protected group and asked for a meeting with Local 1187's Executive Board. Both men and women signed the *1465 petition. At this time Bob Halim was the principal officer of the Union. A meeting with the Executive Board was held on February 16, 1984. Plaintiffs and other men and women who were not in the Protected Group attended the meeting. In September of 1986 another meeting was held with regard to the abolition of the Protected Group. At this time, Gordon Willie was the principal officer of Local 1187. Willie said that the issue would have to be put to a vote.
39. In November of 1986 the Union voted to abolish the protected group. Plaintiffs received no formal notification that the Protected Group was abolished, although if they attended the union meetings in either November or December of 1986 they would have been so informed. Linda Landzettel first realized that the Protected Group was abolished in December of 1986 or the beginning of 1987 when Paul Parker began rotating everyone equally through the various jobs in PQA.

D. Training, Job Assignment and Movement Within PQA.

40. According to the Company's collective bargaining agreement with Local 1187, transfers into PQA from another department are governed by seniority. When bottlers enter PQA they are trained, and if their work is acceptable, their clock number is changed to 3700 or 4100, and they become a permanent lab tech.
41. Once an individual's clock number is changed, she cannot be "bumped" out of PQA by an individual with greater seniority who wants to enter the lab. Furthermore, a bottler with high seniority cannot gain a transfer to another shift by displacing a lower seniority bottler on the desired shift. Rather, bottlers who wish to transfer to another shift must wait for an opening on the desired shift. When an opening occurs, it will be assigned according to seniority.
42. The collective bargaining agreement also provides that seniority will govern layoffs.
43. Although the Union has attempted to secure a system of assigning jobs within departments on the basis of strict seniority ("job bidding"), the Company has strictly refused to be limited in such away with regard to job assignment. See Joint Ex. F at p. 35 (Memorandum of Understanding of July 12, 1973).
44. Nevertheless, in an attempt to accommodate the Union, Company officials in PQA make an attempt to take seniority into consideration when assigning jobs to lab techs. Skill and ability, dependability, and ability to work independently are very important factors in job assignment. When these factors are equal, however, seniority will be a major determining factor.
45. Company officials in PQA look to plant seniority (determined by an employee's date of hiring) rather than the length of time an employee has been in PQA when referring to seniority. Employee lists are often organized by plant seniority, and plant seniority.
46. Bottlers entering PQA are initially trained to run tests on bottle and can units. The lab tech spends approximately one week being trained on can units by a fellow lab tech or, in some cases, by a foreman or supervisor. The lab tech is then placed on the unit another week to ensure that she has retained the necessary skills and information. The lab tech is then trained on other can or bottle lines for approximately four weeks. In all, the lab tech spends approximately five to six weeks learning the basic unit jobs in the production labs.
47. Area Coordinators determine when lab techs will be trained on SVK and PCAS. There are no written guidelines on when to train lab techs on these jobs, but they must get permission from the General Foreman of Packaging, who in turn must monitor the budget and check with the Plant Manager regarding budget concerns. Cletus Hinkamp, when he was Area Coordinator, and Paul Parker train lab techs according to budget considerations, the department's need for more individuals on these jobs, seniority, ability to work independently and ability to perform the type of tasks SVK and PCAS require. Neither Hinkamp nor Parker endeavor to train all lab techs on SVK and PCAS. PCAS is not a "full scale" job. Each unit is only checked once *1466 per week, and the job is not even performed on all shifts. Paul Parker feels that if everyone in PQA were trained on PCAS and SVK, and he rotated every person through the jobs on a weekly basis, then any training would be lost due to changes in the demands of the job that occurred during the time lapse as well as the attrition of skills that naturally occur over such a time.
48. Both Parker and Hinkamp have attempted to honor seniority in determining who to train. If all factors are equal, seniority will control their decision. On occasions when Parker has not followed seniority, he has received strong protests from the delegate.
49. Absenteeism also impacts training, as the decision to train a lab tech must be made as the need presents itself; and lab techs who are not present, obviously, cannot be trained. In addition, absenteeism impacts the Area Coordinator's impressions regarding a particular lab tech's reliability. Furthermore, the attendance log upon which the Area Coordinator relies does not indicate the reason for absences other than vacations.
50. The need to train lab techs, particularly on SVK or PCAS, may vary even on a weekly basis. As PQA has grown progressively busier in recent years, training has become more difficult, and people are only trained when they are truly needed.
51. The number of beer production lines that are actually in operation varies from week to week. Anywhere from seven to fifteen units may be in operation around the clock. Thus, each week anywhere from seven to fifteen lab techs on the red shift may be assigned to production units in a given week.
52. One to two lab techs on each shift perform the PCAS job on each shift each week.
53. One lab tech on each shift is assigned to perform the SVK job.
54. Lab techs not assigned to production labs, SVK or PCAS are assigned to Reprocessing. The number of lab techs assigned to reprocessing is normally between ten and fifteen. Anywhere from one to sixteen lab techs in Reprocessing, per shift, may be assigned to table jobs. Usually one or two lab techs per shift, but sometimes as many as five, are assigned to perform random sampling. On some days the random sampling job is not assigned at all. Two to five employees per shift may be assigned to transport beer by fork truck from Reprocessing to the warehouse areas. Each week one and sometimes two lab techs are assigned to the sorting function.
55. When Cletus Hinkamp became the Area Coordinator on red shift, he initiated a policy that was meant to prevent any lab tech from spending more than two consecutive weeks in Reprocessing. This policy was instituted in response to complaints from low seniority men and women who were spending the greater portion of their time in Reprocessing. Even after the policy was instituted, however, some lab techs spent more total time in Reprocessing than other lab techs.
56. The initial weekly assignment of lab techs in PQA is recorded on documents known as "job assignment sheets".
57. Lab techs who are initially assigned to Reprocessing for a given week, however, do not necessarily spend the entire week in Reprocessing. Rather, Reprocessing serves as a "labor pool" in PQA. Thus, when an absentee occurs in a production lab, on SVK or on PCAS, or an additional production unit is set into operation, lab techs in Reprocessing will be assigned to these "upper floor" jobs. The supervisor in Reprocessing makes assignments to fill upper floor vacancies on the basis of seniority and whether the most senior lab tech in seniority has been trained on the particular job that is open. If the most senior lab tech in seniority does not know the job that is open, the second senior lab tech in Reprocessing is assigned to the job.
58. Supervisors in PQA record the movement of manpower from Reprocessing to other areas in the lab on a document called the "Cost Center Sheet". The purpose of the Cost Center Sheet is to document the specific "costs", in terms of manhours, that a given area in PQA incurs on a daily basis. Thus, if four employees work in Reprocessing for eight hours on a given day, the Cost Center Sheet should *1467 reflect a total of thirty-two manhours assigned to the Reprocessing "cost center" for that day. It is not the practice of supervisors in PQA, however, when filling out Cost Center Sheets to attempt to accurately record every area or "cost center" where an individual lab tech worked in a given day. Rather, supervisors generally attempt to determine the total number of manhours that were expended in their respective area on a given day and then allocate those hours in eight-hour increments among the employees listed on the Cost Center Sheet. Thus, if a total of 24 manhours were expended in Reprocessing on a given day, the supervisor would assign eight hours each to the first, second and third lab techs listed on the Cost Center Sheet. Therefore, the Cost Center Sheets do not provide an accurate record of where each lab tech may have worked on a given day.
59. The most common job openings that arise and allow a lab tech to be transferred out of Reprocessing are on the can and bottle production units. The second most frequent opening, although not nearly as frequent, would occur on SVK. Requests for a lab tech assigned to Reprocessing to fill a vacancy on PCAS are highly infrequent.
60. Assignments to Material Testing and Technical Services are made almost exclusively on the basis of seniority. To acquire a permanent position in these "specialty labs", a lab tech must first get on the respective lab's vacation relief list. Lab techs are placed on the vacation relief lists for Material Testing and Technical Services according to whether they have expressed a desire to work in one of the labs and by seniority. The most senior lab tech on the vacation relief list is allowed to work in the lab when a vacation or other absence in the lab creates a temporary vacancy. It is through serving as vacation replacements that lab techs are trained in these specialty labs.
61. Assignments to the Tower Lab are also made on the basis of seniority. As with the other specialty labs, lab techs who express an interest in the Tower Lab are placed on a vacation relief list according to seniority. Likewise, lab techs are trained in the Tower Lab by serving as vacation relief. Permanent assignments to the Tower Lab are taken from the vacation relief list according to seniority. There are currently five vacation replacements serving the Tower Lab.
62. When Mel Klock was the General Foreman of Packaging he solicited individuals to work in the Tower Lab with the help of shop stewards. The shop stewards would report to Klock the names of lab techs who would like to go to the Tower Lab, and Klock would record the names of these people on a list that he kept. When BQA called and asked for someone to fill in as vacation relief, Klock would assign a lab tech from the list according to seniority.
63. In 1978-1979, Klock encountered increasing difficulty in locating lab techs who were willing to go to the Tower Lab. At this time Klock made an isolated departure from the system of assigning vacation relief to the Tower Lab on the basis of plant seniority. A vacation replacement was needed for the Tower Lab, and because Klock was unaware of any additional existing lab tech who had expressed an interest in the Tower Lab, Klock forced Mike Miskov to serve as a vacation replacement. Miskov was chosen on the basis that he was the most recent transfer into PQA and had spent the least amount of time in PQA. In fact, Miskov had not yet been trained on any job in PQA. Klock felt that the vacation relief job in Tower Lab was the least technical, and, therefore, if Miskov did not like the job, no training would be wasted on him. Therefore, Miskov was assigned to work as vacation relief on January 3, 1979. Miskov was given no choice in the matter. Klock received no complaints from other lab techs with respect to the assignment of Miskov.
64. In late 1984/early 1985 Joe Schiro instituted the system of using a sign-up list to determine what lab techs wish to work in the Tower Lab and Material Testing. Vacation relief assignments to the Tower Lab and Material Testing are currently made by reference to these lists. When an *1468 opening arises, the most senior person expressing an interest in a particular lab is assigned to work as vacation relief. Prior to the posting of these lists, Schiro would go to a shop steward whenever the need for an additional Tower Lab relief-person arose. He assumed that the individual designated by the shop steward was the most senior lab tech interested in the Tower Lab.

E. Assignment to Reprocessing.

65. Following is a list of PQA red shift employees and their plant seniority dates in order of seniority:

 NAME SENIORITY
 DATE
 Hercules, James 04/11/61
 Mourton, Gus 09/18/62
 Waltenberger, Guenter (Gene) 04/08/63
 Large, James 08/03/64
 Hermann, Mark 07/06/70
 Cameron, Richard 09/16/71
 Floyd, Marvin 04/10/72
 Hockerson, Everett 09/18/72
 Horneker, Jr., George 09/25/72
 Denwood, Janet 03/28/73
 Howard, Elizabeth 03/29/73
 Johnson, Jacquelyn 07/09/73
 Clark, Joe 07/16/73
 Long, Patricia 08/13/73
 Cameron, Douglas 07/09/74
 Billy, John 07/09/74
 Brynes, John 10/07/74
 McFadden, Carl 10/07/74
 Nuckolls, Terry 07/11/74
 Bailey, Thomas 11/18/74
 Hasan, Lorene 07/10/75
 Ray, Carolyn 07/10/75
 Ray, James 07/10/75
 Slaughter, John 07/10/75
 Bippin, Michael 09/25/75
 Cobb, Curtiss 07/24/76
 Fraley, Randy 07/24/76
 Landzettel, Linda 07/24/76
 Landzettel, Shirley 07/24/76
 Weiner, Loretta 07/24/76
 George, Shirley 08/07/76

66. Curtiss Cobb concedes that James Ray, John Floyd, Carl McFadden and Randy Fraley are in Reprocessing consistently.
67. Following is a compilation of the approximate number of weeks that each plaintiff, Randy Fraley and Mike Bippen (male lab techs with seniority dates comparable to those of Weiner, Cobb and Linda Landzettel) were assigned to Reprocessing from 1983-1988 according to the job assignment sheets provided by plaintiffs and defendants:

 '83 '84[1] '85[2] '86 '87 '88[3]
 Long 04 04 03 07 10 07
 Weiner 25 16 15 28 13 01
 Cobb 25 24 18 29 17 06
 Landzettel 25 24 18 17 19 13
 Bippen 26 24 19 15 16 12
 Fraley 25 24 14 19 13 12

68. Following is the approximate number of weeks each of the above lab techs was absent during the above years, according to job assignment sheets, due to vacation, sick leave, leave of absence, lay off or suspension:

 '83 '84 '85 '86 '87 '88
 Long 21 06 07 08 14 14
 Weiner 08 17 06 05 15 30
 Cobb 05 03 03 07 08 20
 Landzettel 04 04 01 21 06 04
 Bippen 05 05 02 07 09 04
 Fraley 05 03 10 19 22 04

69. Plaintiffs have not been assigned to Reprocessing with greater frequency than males who have similar seniority dates.
70. The figures that plaintiffs provide with respect to assignment to reprocessing, total hours worked therein and the accompanying graphs (Plaintiff's Exhibit 26) are unreliable because they are based on Cost Center Sheets, which are not an accurate source for such information.
71. A lab tech's inability to perform the PCAS and SVK jobs will not significantly affect the frequency with which the lab tech is assigned out of Reprocessing to fill vacancies on the "upper floors".

F. Plaintiffs' Training Compared to that of Men in Reprocessing.

72. Pat Long's record at the Company is in all respects excellent. Her supervisors *1469 and foremen in PQA all recognize that she is a fine lab tech and a good worker. She has never been formally disciplined by the Company in any manner. In the summers of 1978 and 1979 Mel Klock, in recognition of her capabilities, assigned to Long work as a "lead person", which involved Long's filling in for supervisors that were on vacation.[4] When Long first entered PQA she was trained on can and bottle units. Later, she was trained on SVK, which took approximately three days. She was not trained on PCAS for a long time. She ultimately was trained on PCAS, however, and worked PCAS on and off for approximately one year. After this time the equipment used for PCAS was changed and Long had to be retrained. Long was not retrained on the new PCAS until she made an official request to Joe Schiro. Pat Long has been trained on all of the jobs in PQA.
73. Loretta Weiner's work habits are also highly regarded by foremen and supervisors in PQA. She has never been formally disciplined by the Company. She is recognized as being very precise, although her precision at times borders on "pickiness", which may be counterproductive, particularly with tasks where it is not her job to be picky. Initially, Weiner was only trained on the finish pack job because she was permanently assigned to that task. Weiner took the initiative to learn the other jobs in PQA on her own time and was allowed to work overtime on weekends to learn other jobs. Weiner has received praise from her supervisors for her proficiency on finish pack. Weiner was also selected to do special testing on new PCAS equipment in Technical Services. To date, Weiner knows all jobs in PQA except those in Material Testing, Technical Services and the Tower Lab.
74. Linda Landzettel has a fair reputation as a lab tech. From the early 1980's until late 1985/early 1986 Landzettel had an admitted absentee problem. She received suspensions for excessive absenteeism in 1982 and 1983. Since early 1986, however, Landzettel has "cleared up" her absentee problem. In 1984 then-supervisor Don Kuegler warned Linda Landzettel and Curtiss Cobb for failing to perform work when he found them drawing flower designs on a shelf with glue guns rather than gluing cartons shut as they had been assigned. Nonetheless, Paul Parker testified that Landzettel is "probably a better worker now than she's ever been." Tr. 857.
75. When Linda Landzettel entered PQA she was immediately trained on can and bottle units for approximately three weeks. At the end of her training she could do all jobs on cans and bottles, with the exception of finish pack on bottles. Landzettel spoke with her shop steward in 1983 and set up a meeting with John Poore, who was then General Foreman of Packaging, to discuss training on PCAS and SVK. Poore indicated that he would "keep her in mind" regarding training, but questioned why she would want to perform such dirty and heavy jobs. Landzettel also raised the issue of training at the February 1984 Union Executive Board Meeting regarding the Protected Group. In November of 1987 Landzettel questioned her shop steward Jim Hercules about training. After a meeting with Joe Schiro, Hercules indicated that Schiro said he lacked funds for training. Later in November of 1987 Landzettel spoke with Paul Parker about training, and Parker agreed to train her on SVK. He refused to train her on PCAS, however, because he "did not want everyone to know the job." In March of 1988, however, Parker trained a Dan Hockerson on PCAS when Hockerson had not yet been in PQA a full year. Landzettel wrote a grievance regarding the Hockerson training. Joe Schiro responded to Landzettel's grievance both orally and in writing. Schiro indicated that he would train Landzettel on PCAS in the future when the opportunity and the need arose. As of February of 1989, Landzettel had not been trained on PCAS.
*1470 76. Curtiss Cobb has a rather poor record as a lab tech in PQA. She has been counseled on a multitude of occasions from January of 1979 through July of 1987 for such matters as: inattention to duties, idling and sleeping on the job, failure to follow instructions, refusing to do work, returning from break late, leaving for break early in contravention of specific instructions, failing to fill out reports correctly and failing to find defects she was specifically directed to look for. She has been reprimanded, suspended twice and was ultimately terminated for absenteeism. Cobb has been trained on all can and bottle units. She has not, however, been trained on SVK, PCAS or the "dumping job" in reprocessing.
77. Cobb has spoken with Union officials, Joe Schiro, Paul Parker and Mel Klock with regard to training. She also spoke with David Mulherin of Employee Relation regarding training. Schiro indicated in 1984 that the budget would not allow training her. She has also been informed that no specific rules exist with respect to training.
78. During the time that Cobb and Landzettel attempted to acquire training on SVK and PCAS, men who had been in PQA for a shorter time period than Cobb and Weiner were trained on one or both of these jobs.
79. Lorene Hassan is a female lab tech in PQA assigned to the red shift. Her seniority date is 7/10/75. She is trained on neither SVK nor PCAS. Hassan was not trained, despite her high seniority, because she is only good at routine work and does not perform well without direct supervision.
80. Jim Hercules is a male lab tech in PQA assigned to the red shift. His seniority date is the highest in the department: 4/11/61. He was not trained on PCAS because he lacks the ability and skill to perform the job, and Parker does not consider him to be a very good worker.
81. John Slaughter is a male lab tech in PQA assigned to the red shift. His seniority date is 7/10/75. Paul Parker did not train Slaughter on PCAS because his aptitude is not suitable for the job.
82. Joe Clark is a male lab tech in PQA assigned to the red shift. His seniority date is 7/16/73. Paul Parker did not train Joe Clark because his work habits are poor.
83. Gene Waltenberger is a male lab tech in PQA assigned to the red shift. His seniority date is 4/8/63. Waltenberger has been in the lab for over 25 years and was trained before Parker became Area Coordinator. Parker, however, rarely assigns Waltenberger to the PCAS job if he can avoid it because he frequently breaks equipment, and his work performance is substandard.
84. James Ray is a male lab tech in PQA assigned to the red shift. His seniority date is 7/10/75. He is trained on neither SVK nor PCAS.
85. Dan Hockerson is a male lab tech in PQA assigned to the red shift. His seniority date is 9/25/72. He was trained by Paul Parker on both SVK and PCAS within six months after he came into PQA. Hockerson was trained because he had high seniority and because he took the initiative to learn PCAS. Hockerson would go on his own time with the person running PCAS. By the time Parker formally trained him, Hockerson had learned so much that Parker only had to spend one day with training.
86. Rich Cameron is a male lab tech in PQA assigned to the red shift. His seniority date is 9/16/71. Cameron entered the department in June of 1986, and within eight months he was trained on SVK. Rich Cameron was selected for training on the basis of his high seniority.
87. George Hornecker is a male lab tech in PQA assigned to the red shift. His seniority date is 9/25/72. Parker trained Hornecker on SVK on the basis of Hornecker's high seniority.

G. Plaintiffs' Assignment to Specialty Labs.

88. Pat Long first became interested in Material Testing when she was working as *1471 vacation relief in the lab. She asked Skip Voight how to get in the lab, and he replied that she needed to work vacation relief. She was told that if an opening occurred she could get a transfer slip and he would strongly recommend her for the job. Long sought a transfer slip from Mel Klock in the summer of 1979 and later sought a transfer slip from Joe Schiro, but they were never able to provide her with one. She ultimately got a transfer slip from Ray Wucher, signed it, and turned it in on April 18, 1983. After Long turned in her transfer slip, males were transferred to Material Testing, but all of these individuals had greater seniority than Long.
89. Pat Long first started asking about the Tower Lab when she was working as a lead person. She asked Mel Klock what the requirements were to get into the Tower Lab. He told her that she should show her interest, and she would be asked when an opening arose. On another occasion Long spoke with Charlie Luck, who stated that she should indicate her interest and that she should fill out a transfer slip. Although Long asked, Luck never brought her a transfer slip. Long also raised the subject of the Tower Lab at the February 1984 Union meeting.
90. Long also spoke with Joe Schiro regarding the Tower Lab some six months after he became General Foreman of Packaging. When she indicated some confusion regarding the procedure for transferring into the Tower Lab, Schiro indicated that she needed to put her name on a list, which he would begin to circulate. Long consistently signed the list, but she was not assigned to the Tower Lab, although other individuals were being transferred to the Tower Lab. When she questioned Schiro about her inability to secure a transfer to Tower Lab, he responded that people were being assigned according to seniority.
91. Mike Miskov and William Brawley were first assigned to the Tower Lab in 1979, although Pat Long testified that they went to the Tower Lab in 1983 after she spoke with Schiro. Long took up the matter of Brawley's assignment to the Tower Lab with the Union between 1982 and 1984. Bob Halim, then principal officer of the Union, held a meeting with regard to Long's assignment to the Tower Lab with Industrial Relations. When her Union representatives brought up the issue of Long's seniority, Company officials responded that the collective bargaining agreement did not bind them to assign jobs by seniority. The Company officials stated that absentee records, attitude, ability to do work and discipline records would be considered in making job assignments, and if all these factors were equal between candidates, seniority would be a major factor.
92. In 1986 Pat Long became so discouraged with her progress regarding securing an assignment to the Tower Lab that she indicated on the annual sign-up list that she did not desire to transfer to the Tower Lab. Defendant's Exhibit Y.
93. Nevertheless, in June of 1986 Joe Schiro assigned Pat Long and Shirley Jones to the Tower Lab on the basis of seniority. Although Long expressed some hesitancy as to whether she wanted to go, Schiro urged her to try it out, and Long ultimately went to the Tower Lab as a vacation replacement. Shirley Jones only stayed in the Tower Lab a month before deciding that she did not wish to continue the assignment. Pat Long is now fifth or sixth on the Tower Lab vacation relief list. She worked one week in the Tower Lab in 1986, and three months in 1988. She will ultimately be assigned to the Tower Lab by her seniority date rather than the date that she first entered the Tower Lab.
94. Although Pat Long has never been disciplined for absenteeism, she has accumulated extensive absences due to medical reasons during her career with the Company. Some of her absences were for work-related injuries and some were not. Long missed approximately four to five months for health reasons in 1979, four to eight weeks for health reasons in 1980, five to six months between October 1982 and April 1983 for a work related injury, approximately seventy days in 1984 for illness, approximately 133 days in 1985 for a salivary gland problem, approximately 2 months in 1986 for nasal and ear problems, and approximately 114 days in 1987 for *1472 medical reasons and industrial accidents. From 1982 through November of 1988, Long had accumulated 737 days/147 weeks of absences, second on PQA red shift only to the 815 days accumulated by Shirley Landzettel. After Long, the employees with the most significant accumulated absences on PQA red shift for the same period are: Loretta Weiner (386 days); Linda Landzettel (383 days); Curtiss Cobb (329 days); Carolyn Ray (322 days); and Randy Fraley (298 days).
95. Following are the dates of William Brawley's assignments to the Tower Lab as they correspond to Pat Long's attendance or absences:

Brawley's Assignments Long's Absences
1/1/79 to 1/7/79 Absent 1/1 to 1/14/79
6/18/79 to 8/5/79 Absent 5/8 to 8/5/79
12/3/79 to 12/9/79 Absent 12/3/79
12/17/79 to 1/6/79 Present, but absent 12/10
 to 12/16/79 and 1/1 to
 1/27/80
1/21/80 to 1/27/80 Absent 1/1 to 1/27/80
2/4/80 to 2/10/80 Present, but had been absent
 from 1/1 through
 1/27/80
3/3/80 to 3/30/80 Absent 3/1 to 3/4/80 and
 3/25 to 3/28/80
4/14/80 to 4/20/80 Absent 4/14 to 4/25/80
5/17/82 to 1/9/83 Absent 5/3 to 7/11/82
1/17/83 to 2/20/83 Absent 10/6/82 to 4/4/83
2/28/83 Absent 10/6/82 to 4/4/83

96. Loretta Weiner first inquired with regard to the Tower Lab in 1978. She asked Leon Smitty, the yellow shift shop steward how to get in, and he informed her that she must first work in quality control for a year and then must acquire a transfer slip. Smitty was unable to get Weiner a transfer slip. Weiner later asked Charlie Luck for a transfer slip, but he said there were no openings. Ultimately, the Company began to send around lists regarding the Tower Lab and Material Testing. Weiner always indicated her desire to be transferred to these labs.
97. In late 1978 or early 1979 Luck approached Linda Landzettel and asked her if she was interested in the Tower Lab. After Luck explained the nature of the work and Landzettel indicated her interest, Luck indicated that she would have to fill out a transfer slip. Before Luck brought Landzettel a slip, however, William Brawley was assigned to the Tower Lab. Later, Luck brought Landzettel a transfer slip, which she signed and which Luck processed on 3/23/79. The transfer slip remains in Landzettel's personnel file to date. In late 1979 or early 1980 a co-worker informed Landzettel that Landzettel had been assigned to the Tower Lab, but that she had been replaced by Mike Miskov. When Landzettel examined the posted job assignment list she observed that her name had been scratched off and replaced with Mike Miskov's name.
98. Landzettel has never requested to be placed in Material Testing or Technical Services. In March and June of 1984 Landzettel indicated on sign-up lists that she desired no transfer to either the Tower Lab or Material Testing.
99. Cobb has requested transfer slips to the Tower Lab on various occasions but has never received one. She has always indicated her desire to be assigned to the permanent labs when lists regarding same are passed around.
100. All lab techs who are permanently assigned to the Tower Lab and assigned to the Tower Lab as vacation relief have greater seniority than Weiner, Landzettel and Cobb. All permanent lab techs assigned to the Tower Lab have greater seniority than Long.
101. All lab techs assigned to Material Testing and Technical Services have greater seniority than Long, Weiner, Landzettel and Cobb. The majority of lab techs in Material Testing were members of old Union 262. The most recent seniority date of any lab tech in Material Testing is 10/27/69. All lab techs in Technical Services have been there since 1980. The most recent seniority date of any lab tech in Technical Services is 5/20/63.
102. In February of 1987 the Company entered into conciliation agreements with the EEOC regarding Curtiss Cobb's EEOC *1473 charge # XXXXXXXXX, Pat Long's EEOC charge # XXXXXXXXX, Loretta Weiner's EEOC charge # XXXXXXXXX and Linda Landzettel's EEOC charge # XXXXXXXXX. These conciliation agreements specifically provided that the Company did not admit any violation of Title VII. In return for the Equal Opportunity Commission's covenant not to sue the Company with respect to any matters alleged in plaintiffs' charges of discrimination, the Company agreed to assign lab techs to all future Tower Lab vacation list vacancies on the basis of the lab tech's plant seniority, desire to work in Tower Lab and qualifications to work in the Tower Lab. The Company also agreed to solicit all qualified lab techs on an annual basis, in writing. The Company further agreed to assign Shirley Jones and Patricia Long to the Tower Lab vacation relief. Finally, the agreements provided that the Company would provide written reports every four months for a period of twenty months to the EEOC regarding the availability of Tower Lab vacation relief vacancies and permanent assignments and the manner in which they were filled.

H. Incidents Allegedly Indicating General Discriminatory Attitude Against Women.

103. In August of 1984, the midnight shift in PQA experienced a shortage of low seniority lab techs due to individuals on leave and layoffs. More lab techs were needed on the midnight shift within a week. Joe Schiro met with the shop stewards from the various shifts: Bob Halim from red shift, Bob Minor from yellow shift, and Caroll Pope from midnight shift. Schiro and the shop stewards agreed to an arrangement where the four least senior people on yellow shift, Sara Alge, Sharon Frommann, Dixie Robinson and Bob Minor, would be required to move to midnight. Of these four lab techs, Sara Alge had the greatest seniority, although the four had relatively similar seniority dates. The lab techs were to be presented with the choice of moving to midnight or being moved out of PQA into production. Schiro requested an arrangement whereby these individuals could return to the yellow shift at a later date. The Union refused to permit such an arrangement.
104. Ultimately, Alge, Robinson and Minor moved from the yellow to the midnight shift. Sharon Frommann, however, refused to transfer to midnight. Within two hours of refusing Frommann's clock number was changed, and she was assigned out of PQA. Approximately two weeks after these individuals moved from yellow shift to midnight a need for additional lab techs on the yellow and red shifts arose. A Mr. Mitchell, who had the highest seniority on midnight shift, transferred from midnight to yellow on the basis of seniority. No grievance was ever filed by this group of lab techs with respect to any aspect of the transfer from yellow to midnight.
105. Elizabeth Howard is a black female. She was hired by the Company in March of 1973. She was first assigned to PQA in 1975-1976 and was trained on all jobs. In September of 1987 she transferred into PQA for the second time and was assigned to red shift. Due to changes in some of the jobs, Ms. Howard had to be retrained. Although individuals who started in PQA at the same time as Ms. Howard were trained by one lab tech for an entire month, Ms. Howard was trained by several individuals. Ms. Howard complained to her foreman about the manner of her training. On one occasion foreman Ron Keller became very agitated and insulting toward Ms. Howard when she made a mistake while working on a can unit. Ms. Howard did not receive her PQA clock number until she had trained in PQA for five to six weeks. In late 1987 or early 1988 Ms. Howard filed a grievance regarding her training.
106. Ms. Howard has been counseled and met with Company officials on numerous occasions regarding her inability to retain training information. Several supervisors turned in reports stating that Howard had difficulty retaining information and doing the job. The supervisors opined that Howard should not be permanently assigned to PQA. Foreman Ron Keller was very involved in Ms. Howard's training. If Keller showed Howard a task on one day *1474 she had to be shown the task again three or four times the next day. Howard also recorded information improperly and encounter difficulties in finishing work and remembering. Keller has encountered similar problems when training male employees, although their problems were not as extensive as Ms. Howard's. Men who work in PQA for such an extensive period of time without being assigned clock numbers are generally not made permanent lab techs.
107. Beginning in March of 1988 Ms. Howard took a two-month leave of absence. When she returned she was scheduled for Reprocessing and remained in Reprocessing for a full year. This assignment was pursuant to Ms. Howard's request. She was not rotated to upper floor jobs, and she did not receive further training until she met with Company and Union officials. During these meetings it was determined that Ms. Howard would be given additional opportunities to train. She was ultimately placed on a regular rotation. Ms. Howard is still, however, encountering some trouble in performing regular PQA tasks.
108. When Weiner first entered PQA she was solicited by delegate Charlie Luck for a permanent assignment in finish pack. At the time there were three permanent finish pack positions, which were held by Lonnie Loncaric, Jim Large and Don Gannon. Don Gannon was leaving to take a permanent position in Material Testing. Loretta was told that her position would be permanent, although she would have the lowest seniority among the three permanent finish pack lab techs. In 1982 George Horniker, who had previously been a bottler, entered PQA. Horniker had always worked "late side" and wished to continue this shift. Because finish pack was a "late side" job, Area Coordinator Ray Wucher asked Weiner to train Horniker on finish pack. Wucher also informed Weiner that she would have to rotate with Horniker from finish pack to reprocessing on a weekly basis. Weiner trained Horniker; however, because her feelings were hurt and she felt offended by this arrangement, Weiner asked to be taken off the finish pack job. Ultimately, the permanent finish pack job was discontinued.

I. Overtime Solicitation.

109. Individuals in PQA have the opportunity to work overtime on Saturdays, Sundays or Holidays. An individual's eligibility for overtime opportunities is based on the total number of overtime hours that the individual has worked and/or had the opportunity to work. Lab techs who have the lowest total are given the first opportunity to work overtime.
110. Lab techs start each calendar year with zero total overtime hours. When the individual either works overtime or declines an opportunity to work overtime she is "charged" with the hours of the particular overtime shift. An individual who is absent or on vacation when overtime is solicited is not to be charged, but the individual also forfeits the opportunity to work overtime for that particular week. The company has a policy that if individuals do not work on Friday they cannot work overtime on Saturday either.
111. The PQA production schedule is published each Tuesday. The Area Coordinators determine the production needs of the department, the number of overtime slots needed to meet said needs, and the number of people needed to fill said slots.
112. The number of overtime hours each individual works is entered into a computer on a weekly basis by Labor Control. Each week a computer printout is generated, which lists each lab tech in PQA in the order of his or her accumulated overtime hours, beginning with the lab tech with the lowest number of accumulated overtime hours and ending with the lab tech with the highest total accumulated hours. This list is distributed to the shop steward, who solicits individuals for overtime on Thursday and, if additional overtime spots become available due to production schedule changes, on Friday. The shop steward returns the list to the Area Coordinator on Friday. After the Area Coordinator checks to see that everyone has been asked, the list is returned to Labor Control to compile the new data.
*1475 113. At least since the late 1960's the Company has completely delegated the task of overtime solicitation to union delegates. These individuals receive their regular hourly wage when they are soliciting overtime. The Company provides no specific guidelines to make sure that overtime solicitation is done fairly, and the Area Coordinator does not oversee solicitation is done fairly. It is expected, however, that union delegates will solicit individuals in the order that their names appear on the list so that individuals with the lowest total accumulated hours will get their first choice of the available jobs. Area Coordinators cannot tell by looking at the list if individuals were solicited in the proper order. Coordinators expect that any employee encountering a problem with overtime solicitation will inform them. This is the only way the Coordinator would know of improper overtime solicitation.
114. Presently, individuals cannot be charged with overtime hours unless they initial the computer list when approached by the delegate. As late as 1981, however, computer lists were not in use and delegates were not required to obtain signatures.
115. Prior to 1984, any individual who was absent due to illness, was charged with the average number of overtime hours that lab techs on that particular shift worked while he or she was absent. After Pat Long complained to the Union about such "overtime averaging", however, the practice was stopped.
116. In January of 1981 Loretta Weiner discovered that her then-delegate, Charlie Luck, had charged her twice for overtime in a single day. When Weiner confronted him with this discrepancy, Luck apologized and stated that he had made a mistake.
117. Also in 1981, while Luck was soliciting Weiner for overtime Weiner determined that Luck had scheduled "fourth floor" workers, who were not to be solicited until all red shift workers had been solicited, for more desirable "fifth floor" jobs. Weiner reached this conclusion when she observed that when Luck came to her with the overtime list, the fourth floor workers had already signed-up for overtime.
118. While Luck was soliciting Weiner for overtime in March of 1981 he informed her that only Reprocessing assignments were available. Weiner asked to see the clipboard holding the overtime list. Luck tossed the clipboard onto the ground, and when Weiner picked it up, she discovered that more favorable assignments than Reprocessing were available. She insisted on receiving a more favorable assignment, and Luck complied.
119. Both Weiner and Pat Long have, on occasion, been greeted by "clipboard throwing" and responses of general annoyance when they have asked delegates to examine overtime lists. Such "throwing" usually consisted of flipping the clipboard approximately six feet onto the ground. Terry Nuckolls, Jim Hercules and Charlie Luck have been the worst offenders in Weiner's experience. After the clipboards were thrown, plaintiffs were not prevented from examining the overtime sheets. These incidents all occurred before computer sheets were put into use, after which time no employee could be charged with overtime until she had signed the computer sheet. Furthermore, these incidents were not reported to the Company.
120. On one occasion between 1979 and 1980 Long asked delegate Rich Seratti to see an overtime clipboard. Seratti responded by throwing the clipboard and becoming abusive. Long reported the incident to union officials, but she did not report it to the Company because she felt that "overtime was between the delegate and [her]self." Tr. 186.
121. On occasion Long has been solicited for overtime when all production lab jobs were taken by the individuals immediately preceding her on the overtime sheet. Several hours later, after Long has accepted a Reprocessing assignment for overtime, additional production lab jobs may become available. She has not been allowed, however, to change her overtime selection to the production lab assignment. In addition, Long has chosen a production lab job, and later in the day the Company *1476 has decided not to run that particular unit on Saturday.
122. When Long has left before the end of her shift on Friday, she has been denied the opportunity to work overtime on Saturday. In 1985, on a Friday, Long overheard a group of three to four men, which included Terry Nuckolls and a Mike Goodin, discussing a fishing trip to "Kimmswick" that they intended to leave for after lunch. The men did work the next day.
123. On July 9, 1983, Weiner recorded an "incident" in her notebook involving delegate Tom Bailey and Mike Bippen. On this occasion Weiner and Bippen had accumulated the same number of overtime hours. Weiner assumed that because Bippen wanted to go fishing, the delegate would solicit Weiner before Bippen so that Bippen could go fishing without being charged for declining overtime hours. Bippen, however, was solicited before Weiner, and he accepted the overtime opportunity. Weiner was not solicited.
124. In 1986 Weiner overheard Paul Parker calling Mike Bippen at home while Bippen was on vacation to solicit overtime. Weiner told Parker that she expected the same treatment. On a later date Parker did, indeed, show Weiner such preferential treatment.
125. In 1986 delegate Terry Nuckolls charged Weiner for declining a weekend of overtime. Weiner, however, had not been solicited and had not signed the computer sheet. Weiner challenged being charged, and Bill Brinkmeyer in Employee Relations ultimately upheld her challenge, saying that if she had not signed the sheet, she could not be charged with the overtime hours. Weiner's accumulated hours were adjusted accordingly.
126. Weiner never filed a grievance with respect to any alleged favors being granted to men, because she did not care if the individuals were disciplined.
127. Weiner concedes that if men were allowed consistently to clock out early to avoid being charged with declined overtime hours they would be disciplined by the Company for absenteeism.
128. On a Thursday in the sixth floor breakroom, while delegate Terry Nuckolls was soliciting overtime, Linda Landzettel overheard the following exchange between Nuckolls and Mike Bippen: Bippen yelled, "When do you think you'll be getting to me?" Nuckolls replied, "It will be soon." Bippen replied, "Good, I'm going to leave today; I'm going fishing."
129. Neither Mel Klock as General Foreman nor Cletus Hinkamp as Area Coordinator remember complaints regarding overtime being solicited out of order. Likewise, Joe Schiro never received complaints or grievances from plaintiffs regarding overtime, and he is not aware of men being allowed to leave early on Fridays and work Saturdays or incidents of clipboard throwing. Both Klock and Paul Parker, however, have received more general complaints regarding the solicitation of overtime from both males and females with great frequency. When complaints were made, it was the practice of both Parker and Klock to investigate.

J. Alleged Retaliation.

130. Patricia Long filed a charge of discrimination with the EEOC against the Company on April 24, 1984 (# XXXXXXXXX). She alleged sex discrimination because she had been denied training in the Tower Lab and was relegated to reprocessing, while men in the Protected Group received more favorable treatment. She claimed that job assignments were made on the basis of sex, that in January of 1984 she was not allowed to smoke in draft beer although men were smoking in the area and that she was reprimanded in April of 1983 for refusing to do a job she had been medically excused from performing.
131. Linda Landzettel filed a charge of discrimination with the EEOC against the Company on October 3, 1984 (# XXXXXXXXX). She alleged sex discrimination because she was assigned to reprocessing more than males who were assigned to "protective" jobs and was assigned the least skilled, dirtier jobs while in reprocessing, while men were assigned to the more favorable jobs. She also alleged that men enjoyed *1477 enhanced opportunities to be transferred to Material Testing and the Tower Lab. She specifically complained of the assignment of Mike Miskov to the Tower Lab.
132. Loretta Weiner filed a charge of discrimination with the EEOC against the Company on February 28, 1985 (# XXXXXXXXX). She alleged sex discrimination therein. Her charge generally mirrors that of Linda Landzettel, although it does not mention the Mike Miskov incident.
133. Curtiss Cobb filed a charge of discrimination with the EEOC against the Company on February 28, 1985 (# XXXXXXXXX). She alleged sex discrimination therein. Her charge generally mirrors that of Landzettel and specifically mentions the Mike Miskov incident.
134. Prior to 1983 job assignment sheets for the red shift in PQA were posted in a public area on a master chart, which reflected each lab tech's assignments for an entire month. In September of 1983 these "master sheets" were no longer posted. Rather, weekly job assignment sheets were posted where the master sheets had once been, and the master sheets were kept in the Area Coordinator's office. The master sheets remained available for examination by any lab tech who wished to see them. Cletus Hinkamp quit posting the master sheets in September of 1983 because both men and women were complaining about job assignments, and they were spending a great deal of time standing around and comparing who worked where. Pat Long asked Paul Parker to put the master sheets back up when he became Area Coordinator, but he refused to do so for the same reasons that Hinkamp originally took the master sheets down.
135. Plaintiffs' are all familiar with the grievance system and have all filed grievances on several occasions. Grievances can be processed without the signature of a lab tech's shop steward, although the Union prefers that grievances be signed by a shop steward. In the vast majority of cases, plaintiffs' grievances have been processed according to regular Union procedures. On some occasions, both before and after plaintiffs' charges of discrimination were filed, Union officials have resolved conflicts between plaintiffs and the Company before a grievance was even filed or without resort to grievance procedures.
136. When Pat Long first started at the Company she was subjected to insulting, obscene and sexist remarks by her co-workers. Such behavior by her co-workers, however, did not persist beyond the first few years of her employment.
137. Paul Parker has made remarks to plaintiffs at various times regarding "people who make waves" and "people causing trouble".
138. The red shift is the source of an inordinate amount of problems and friction. A great deal of maneuvering and bickering takes place with respect to job assignment. A number of the male lab techs on red shift find it difficult to get along with one another. It is an employer's nightmare!
139. After Long filed her charge of discrimination she became involved in an argument with Tom Bailey, a red shift Union delegate, who felt that she was causing trouble by filing lawsuits.
140. On or around the date that the Company received a copy of Long's charge of discrimination Tom Schinsky, who was serving as a relief foreman at the time, assigned Long to perform multiple tasks. Long became quite irritated and complained that Schinsky would have to prioritize which tasks he wanted done first because she could not perform all of the assignments simultaneously. Schinsky explained to Long that he had just come over from midnight shift the previous week and that it was the regular practice on the midnight shift for a single lab tech to perform all of the assigned tasks. Schinsky did not know of Long's filing with the EEOC at the time of this incident.
141. On one occasion after Long filed her charge of discrimination, Paul Parker told her never to write "no time" on her data sheets when she was running tests and could not complete a test. Long had observed other lab techs write "no time" on their data sheets without criticism and assumed that it was an acceptable practice. *1478 Parker has criticized other employees, including men, for writing "no time" on data sheets. He prefers that lab techs not record "no time" on their data sheets unless they have reached the end of their shift.
142. In February of 1988 Parker called Long out of reprocessing and told her to take ten cases of beer to the Tower Lab on a flatbed. Long informed Parker that she had recently been injured and would require some assistance. Parker agreed and assigned two men to go with her. On her way out of the Bevo building Long encountered some resistance from the security guard, who would not allow her to take the beer out of the building without prior approval. After a phone call from Parker, however, Long was permitted to leave the building. When Long arrived at the Tower Lab the lab tech on duty had not been informed that she was bringing the beer. Nonetheless, the lab tech suggested a location to unload the beer, and Long, with the help of the two men, unloaded the beer at that location. Long's helpers then left for lunch, and Long called Parker to report that she had done the job. Parker then told Long to return the beer to the Bevo building, but he did not provide an explanation when Long questioned him why. Long said that she would have to wait until her helpers returned from lunch and Parker agreed. When her helpers returned, Long and the two men loaded the beer, returned it to the Bevo building and unloaded it by the medical unit in the Bevo building. Long's two helpers then left on a break. The security guard then told Long that she had to move the beer closer to his desk where he could watch it. Long moved the beer to the guard's desk and called Parker to tell him where she had left the beer. Parker then instructed Long to bring the beer back to reprocessing, take the ten cases off the cart, put ten new cases on the cart and return those ten new cases to the guard's desk. As Long was loading the cart on the elevator to return to reprocessing, however, the cart shifted, causing Long to strain her back and stomach muscles. Long took the cases to Reprocessing and informed the Reprocessing supervisor that she was injured and that she had to go see the nurse.
143. Long was chosen to take these cases of beer to the Tower Lab in February of 1988 because she was the only person who was familiar with the particular lab in the Tower Lab where the beer was to be taken. Time was of the essence because a highly sensitive, confidential quality control problem had arisen, which constituted a "real crisis" situation. Parker assigned two men to accompany Long to help expedite performance of the task.
144. In January of 1984 Long was smoking in draft beer when Don Kuegler informed her that people were not allowed to smoke in the area. Long objected, noting that men just a few feet away from her were smoking. The men in the area were machinists. The machinist bench area is adjacent to the shipping and warehousing area. Machinists are allowed to smoke in their area, but all lab techs are prohibited from smoking in shipping and warehousing. After Long complained about the incident and a meeting was held at the plant manager's office, the company ultimately compromised its policy and allowed Long to smoke if she stood in the machinist's area.
145. At some unspecified time after Long's charge of discrimination was filed, supervisor Don Kuegler informed Pat Long that she should no longer park her car near draft beer, which is located at a remote location in the Bevo building, and report to draft beer without first passing through Reprocessing. Long became extremely agitated with this decision, and insisted that other individuals took the short route to reprocessing. At the time of this incident Don Kuegler did not know that Long had filed a charge of discrimination. Kuegler did not want Long to take the "short cut" to draft beer, because when Long and other lab techs did so, they would call and ask the foreman to bring the keys used to operate the draft beer machinery out to the remote location. This practice, however, was not proper procedure for the department. When lab techs engaged in this practice, the foreman was not always able to bring the keys to the remote location *1479 immediately, and without the keys, the lab tech could only stand idle until the foreman arrived. Thus, Kuegler wanted to make sure that Long reported to Reprocessing before going to draft beer to eliminate the possibility that she would be delayed in performing her tasks.
146. In September of 1986 Long believed that she was scheduled to take two weeks of vacation for the weeks beginning August 31 and September 7. Lab techs who are scheduled for vacations receive their paychecks for the full vacation period the Thursday before they are scheduled to take a vacation. When Long did not receive her paycheck the week before August 31, she referred to the master list for vacations posted in PQA and found that, according to that list, she was scheduled for vacation on August 31 and September 7. Long complained to her shop steward Cletus Hinkamp and complained that she had not received her check. Hinkamp informed Schiro that a mistake had been made, that Long was angry and that something had to be done to cure the error immediately. When Schiro examined the official records, however, he discovered that either Long or the delegate soliciting her for vacation had transposed the dates of Long's vacation so that according to the official records, she was scheduled for vacation on the weeks beginning September 7 and September 14. Schiro informed Long of the mistake, and Long became even more irate. Schiro, however, checked with Dave Mulherin in Employee Relations, who told Schiro that it would cause no problem to allow Long to go on her vacation as planned. In addition, Gordon Wiley of the Union intervened on Long's behalf. Therefore, Schiro informed Long that she could take her vacation as planned. Long then demanded her paycheck. Schiro informed her that her paycheck was another matter because it was difficult to secure a check from the payroll department that late in the week. Long then called her family and changed her vacation plans. She then returned to Joe Schiro and told him to forget the matter and that she would take her vacation according to the days on the official schedule. Long ultimately took her vacation for two weeks and received her paycheck the Thursday before her vacation began.
147. In 1985 Long sought to purchase a home. The house closing was set for April 1, 1985. On March 11, 1985, Employee Relations received an employment verification loan from Long's lender. The form was processed on March 18, 1985, and returned to Long's lender. A mistake was made in the payroll department, however, and Long's income for the year of 1985 was grossly understated. On the basis of this faulty information, Long's lender refused to issue her loan. Long informed Employee Relations of the mistake, and Thomas Biggar of Employee Relations called Long's lender on March 26, 1985, with the correct information. Biggar wrote a letter to Long's lender on March 27, 1985, confirming his conversation. Nevertheless, Long ultimately missed her April 1 closing date. Thomas Biggar did not know of Long's EEOC charge until June or July of 1989.
148. On August 22, 1989, Tom Schinsky, while serving as a relief foreman in Reprocessing, wrote up Pat Long in the form of a counseling for eating in the work place. Schinsky had warned Long and two other employees the previous day about eating in Reprocessing. Schinsky strictly enforces the Company's rules against eating in the work place. When he serves as a relief foreman, he often finds it necessary to warn employees of his policy during his first few days on the shift. On this occasion, he felt that, given the fact that he had warned Pat Long the day before, Long was challenging his credibility. A union representative became involved on Long's behalf, and the counseling was ultimately removed from her file.
149. In September of 1987 Long was working on a bottle unit. A "crown change" was taking place, and she was holding back beer as it came out of the pasteurizer. She told a co-worker, Otto Speringer, to turn off the pasteurizer. Speringer cursed at Long, told her to get out of the way and pushed her against a railing. Long was injured in the incident and, afterwards, she informed her delegate *1480 that she was going to the nurse. The delegate told her not to "snitch" on another Union member when she explained the accident to the nurse. Long told her foreman Cletus Brandt about the incident as well as Joe Schiro. She told both Brandt and Schiro that she did not know why Speringer had acted in such a manner.
150. On an unspecified date, Long discovered a cartoon that had been posted on a bulletin board in PQA that depicted a doctor holding a new born baby by the feet. The caption of the cartoon read "Get me a lawyer." The cartoon had been modified by labeling the baby "Pat Long". On another occasion obscene comments about Loretta Weiner were found scratched on fork trucks in Reprocessing. The cartoon matter was referred to Joe Schiro and to David Mulherin in Employee Relations. Mulherin spoke with Pat Long about the cartoon incident and asked her how she could help him prevent a recurrence. Mulherin and Long agreed that trying to find out who had posted the cartoon would not be fruitful. Mulherin issued a memorandum to all shifts, which indicated that such posting would not be tolerated. Long also met with Joe Schiro regarding the cartoon incident, and Schiro asked Long if she could help him found out who posted the cartoon. Long stated that she had no idea who posted the cartoon. In response to the cartoon incident and the comments on the fork truck, Schiro assembled all shifts, supervisors and coordinators and informed them that the Company did not condone such actions. Schiro went through the Company's human resource policy directing that all people work together in harmony. He stated that further incidents would result in discipline and even termination.
151. In Long's first week in the Tower Lab, Tom Brawley was getting lunch for the other lab techs. It was customary for the individual who was hauling beer, as Tom Brawley was, to get lunch for the entire lab. One individual indicated that he wanted Brawley to get lunch from a location that was different from the location that Brawley planned to go for the other lab techs' lunches. Brawley agreed to do so. When Long asked Brawley if he would get her lunch from this other location as well, Brawley refused and said that he would only get her lunch from the location where he planned to go for the other lab techs' lunches. Long did not report this incident to the Company.
152. For the week beginning April 11, 1983, Long arranged with Area Coordinator Ray Wucher to be assigned to Reprocessing due to an injury to her wrist. Wucher agreed that Long would be the last lab tech assigned out of Reprocessing that week and informed Reprocessing supervisor Lydia Stewart to that effect. On Tuesday of that week Long informed Stewart that she could not "spin bottles" due to her wrist injury. Stewart acceded to Long's request, but informed Long that she should get a "light duty letter", which Long did. On Thursday of that week Stewart received a call from the fifth floor asking for a lab tech. Stewart assigned Long to the job. Long objected, but Stewart told Long that she was the last lab tech in Reprocessing and, therefore, according to the agreement with Wucher, had to go. On Friday of that week when Stewart was making assignments out of Reprocessing, she told Loretta Weiner to report to the fifth floor. Long protested and said that Long should go because she had greater seniority. Stewart told Long that she could not go because she was to be the last lab tech out of Reprocessing for that week. Weiner volunteered to give Long the fifth floor assignment, but Stewart replied that she was not going to let Long tell her how to run her shift. Pat Long then became angry and asked to see her delegate. Stewart told Long to stand on the repack side until her delegate arrived. Long replied that she refused to do anything until her delegate arrived. Stewart asked Long if she was refusing to do her job, and Long replied "you're an asshole, and I'm not doing anything until I see my delegate, even if you have to take me off the clock." Stewart then took Long off the clock and sent her to the breakroom until her delegate arrived. Later in the day, Stewart received a call from the acting coordinator *1481 informing her that Long was returning to work. Stewart suggested that Long be assigned to the sixth floor because no lab techs remained in Reprocessing, and Stewart had received a call from sixth floor earlier requesting a lab tech. Long was assigned to "spin glass" when she arrived on the sixth floor. Stewart did not know the nature of the job on the sixth floor when she sent Long there. Lydia Stewart wrote up an incident report regarding Long's refusal to do work. After Long filed a grievance regarding the incident report a hearing was held. The hearing was ultimately reduced to a debate regarding Stewart's assignment of Long to spin bottles on the sixth floor. Stewart has disciplined men and taken them off the clock when they refused to do a job.
153. In January of 1986 Lydia Stewart observed Linda Landzettel and a co-worker, Carolyn Ray, involved in a physical fight. Landzettel and Ray were immediately suspended pursuant to Company policy strictly prohibiting fighting. Subsequently, Landzettel and Ray were terminated. In February of 1986 Ray and Landzettel met with Gordon Wiley and Ray Fagas (Landzettel's father and also an hourly employee of the Company) at the union hall. Wiley informed Landzettel and Ray that the Union had worked the Company down to a four month suspension without pay. Wiley informed them that in the alternative, they could grieve their termination. Everyone agreed that the best resolution would be for Ray and Landzettel to accept the suspension.
154. In June of 1985 an incident occurred where Jim Guttman, in retaliation for pranks that Fred Tuhro had played on him earlier in the day, crept behind Tuhro in the lunchroom and cut off Tuhro's ponytail with his pocketknife. Although Tuhro was quite upset by Guttman's retaliatory prank, there is no indication that the matter escalated into a fight. The two men were only required to apologize to one another.
155. Numerous male employees have been terminated or suspended for longer periods than that imposed on Ray and Landzettel.
156. In May of 1986 or 1987, while Loretta Weiner was spinning bottles, supervisor Skip Voight instructed Weiner to alter her reports regarding foreign matter in beer to correspond to his assessment of the quality control problems. When Weiner refused to do so, Voight stated, "You must be sleeping with your brother because you act just like him." Voight was disciplined by the Company for this incident. He met with the plant manager and was told that future conduct of this sort would result in his termination. He was taken off red shift as a supervisor and placed on yellow shift. He was also forced to apologize to Weiner.
157. In May of 1987 supervisor Ron Keller yelled at Loretta Weiner for failing to inform him that a unit to which she had been assigned began to run. Weiner stated that it was not her job to tell him when the unit started, which Keller now concedes. Keller was actually not that upset with Weiner, and attempted to explain to her why he had yelled, but she did not understand. Keller has yelled at men on the job before, and Weiner has observed him do so.
158. On an unspecified date, Ron Keller assigned Weiner, who was driving a fork truck to perform a task known as "layer random sampling". This task involves entire cases of beer from large stacks of beer cases piled on pallets. Keller instructed Weiner to do the task according to the procedure that had always been used in Reprocessing. Keller later discovered Weiner cleaning up a pallet that had spilled. Weiner complained that she felt the procedure was dangerous, the cases of beer were too heavy and that it hurt her back to pull cases of beer in this manner. Keller informed Weiner that this was the way the procedure had always been done. Weiner ultimately filed a grievance regarding the manner in which layer random sampling was performed. Ultimately, in response to Weiner's grievance, the Company wrote a new procedure on how to conduct layer random sampling.
*1482 159. On July 18, 1987, supervisor John Dempsey assigned Weiner and Cobb to work in an area adjacent to Reprocessing. Their task required them to travel to the warehouse area on forklifts and bring pallets of beer to the work area. They were on afternoon shift, where lunch begins at 6:55 and ends at 7:20. Workers are not expected to be back to their work areas, however, until 7:25. At lunch time, Dempsey informed Cobb and Weiner that it was time for their lunch break and observed that they had completed their assignment with respect to pallets numbered 1 through 11. After lunch, at approximately 7:45, Dempsey realized that he had seen neither Cobb nor Weiner since lunch. When Dempsey had still not seen Cobb nor Weiner behind the pallets at 8:00, he went to where they were supposed to be working. When he did not see their fork trucks he drove his electric scooter out to the warehouse area to see if they were bringing in beer. He did not find them on the path to the warehouse or in the warehouse. At approximately 8:20 Dempsey informed Paul Parker that Cobb and Weiner were missing. Parker joined the search, as did the shift delegate. At 8:25 Weiner and Cobb were found in the warehouse area moving their trucks in to pick up pallets 12 and 13 to return to their work area. Cobb and Weiner were told to report to Reprocessing. When they returned, Dempsey informed Cobb and Weiner that he had not seen them for some time and needed and explanation. They were told to take a break first and then return to his office with an explanation. When Cobb and Weiner returned from their break and while they were walking to the office with Dempsey, the delegate and Parker, Parker mumbled something under his breath regarding "people who make waves". To avoid embarrassment, Cobb and Weiner were interviewed in Dempsey's office separately. Their delegate, however, was present. They stated that they had returned from lunch and gone to pick up pallets 12 and 13. They claimed that on the way they had stopped to use the restroom. They claimed to have witnesses; however, when Dempsey later interviewed the alleged witnesses, they could not say for certain whether they had seen Cobb and Weiner between 8:00 and 8:25. In addition, Dempsey felt that 25 minutes was a long time to go to the bathroom and that Cobb and Weiner's stories were inconsistent. Originally Weiner stated that she was on the job the entire time, and Cobb said that she had been gone twenty minutes at the most.
160. Dempsey ultimately wrote an inter-office memo to Joe Schiro wherein he stated that he had not seen Cobb nor Weiner for one and one-half hours. Dempsey wrote up an incident report, and it was Joe Schiro's decision to determine whether discipline was justified. Parker played no role in imposing any discipline. The charge in Dempsey's incident report was for Cobb and Weiner being missing from the work place for twenty-five minutes. Dempsey was not aware of either Cobb or Weiner's charge of discrimination until he presented his inter-office memo to Schiro. At this time Schiro stated that he wanted to be sure of the facts because these ladies had filed a discrimination suit against the Company.
161. Dempsey enforces lunch and break time-limits strictly to avoid the "snowball effect" of people becoming lax about returning from breaks. He is held strictly accountable for efficiency within his area. He has disciplined male bottlers for returning from a break even five minutes late.
162. On an unspecified date Cobb and Weiner were leaving early to get lunch because they did not bring their lunch on that day. Parker refused to allow them to leave early. When Cobb and Weiner protested, he told them that he would get a lunch runner for them, but they could not leave early.

CONCLUSIONS OF LAW
Jurisdiction and venue are proper in this Court. 28 U.S.C. §§ 1331, 1343(4), 1391(b); 42 U.S.C. § 2000e-5(f)(3).
42 U.S.C. § 2000e-2(a)(1) provides in pertinent part:

*1483 It shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to ... compensation, terms, conditions, or privileges of employment, because of such individual's ... sex.
The filing of a timely EEOC charge is a prerequisite to invoking federal court jurisdiction under Title VII. Satz v. ITT Financial Corp., 619 F.2d 738, 742 (8th Cir. 1980); Olson v. Rembrandt Printing Co., 511 F.2d 1228 (8th Cir.1975). In "deferral states", states that have their own state or local employment opportunity commissions, a party must file with the EEOC or the state agency within 300 days after the alleged unlawful employment practice. 42 U.S.C. § 2000e-5(e). When, however, a complainant challenges an ongoing pattern or practice of discrimination rather than one isolated instance, the alleged violation may be deemed "continuing". Chaffin v. Rheem Mfg. Co., 904 F.2d 1269, 1271 (8th Cir.1990); Satz, 619 F.2d at 743. In addition, "[a] Title VII complainant may raise claims in court `like or related' to the substance of the complainant's charge before the EEOC." Satz, 619 F.2d at 741. Title VII complainants are generally laypersons, and the charges made by such lay complainants are to be construed broadly and in a liberal manner. Jenkins v. Blue Cross Mutual Hospital Ins. Co., 538 F.2d 164, 167-68 (7th Cir.1976); EEOC v. Western Publishing Co., 502 F.2d 599, 602-03 (8th Cir.1974).
The plaintiff in a Title VII case bears the initial burden of demonstrating by a preponderance of the evidence a prima facie case of sex discrimination. Once the plaintiff meets her burden, the employer can rebut plaintiff's prima facie case by coming forward with legitimate nondiscriminatory reasons for its actions. The burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the reasons that the employer has articulated are, in fact, a pretext for unlawful discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Chaffin v. Rheem Mfg. Co., 904 F.2d 1269, 1272 (8th Cir.1990). "Despite these shifting burdens, the plaintiff retains throughout the case the ultimate burden of persuading the trier of fact that the employer discriminated against her." Chaffin v. Rheem Mfg. Co., 904 F.2d at 1272, (citing Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981)). A Plaintiff who proceeds under a disparate treatment theory[5] of discrimination rather than a disparate impact theory[6] bears the burden of proving that her different treatment was the result of a discriminatory motive on the part of her employer. Meyer v. Missouri State Highway Commission, 567 F.2d 804, 807-08 (8th Cir.1977).
"What constitutes a prima facie case of discrimination necessarily varies according to the facts of the case." Meyer, 567 F.2d at 808. A prima facie case can be established through direct proof of discrimination. A plaintiff can make also out a prima facie case through indirect proof by meeting the factors set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the McDonnell Douglas test a plaintiff must show:
1. She is a member of a protected class;
2. She applied for and qualified for a job for which the employer was seeking applicants;
3. Despite her qualifications she was rejected;
4. After her rejection, the position remained open, and the employer continued *1484 to seek applications from persons with plaintiff's qualifications.
Meyer, 567 F.2d at 808. The McDonnell Douglas test applies as equally to promotion and job relocation cases as it does to cases involving initial hiring decisions. Id. In addition, a plaintiff can meet her burden of proving a prima facie case by establishing a "pattern and practice" of discrimination: that the employer has intentionally engaged in a systematic disparate treatment of women. See, e.g., Hazelwood School Dist. v. United States, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).
Plaintiffs have cast their claims of sex discrimination under the theory of disparate treatment. They raise six different areas in which the Company allegedly discriminated against them on the basis of sex: (1) The Protected Group; (2) assignment out of Reprocessing; (3) training; (4) assignment to the Tower Lab, Material Testing and Technical Services; (5) overtime solicitation; (6) retaliation. The Court will discuss each area of alleged discrimination separately.
As a threshold matter, however, the Court will address the incidents to which plaintiffs point as examples of the Company's discriminatory attitude against women. With respect to the August 1984 transfer of four yellow shift employees to midnight shift against their will, the Court finds absolutely no indication of discriminatory motive. The Company explained that legitimate manpower concerns had arisen on the midnight shift and that these four individuals were forced to transfer on the basis of their low seniority. These individuals did, in fact, have the lowest seniority on yellow shift. Furthermore, one of the employees, Bob Minor, was not only a male, but was also a Union delegate who took part in the decision determining how to handle the forced transfer. Nonetheless, Minor was granted no preferential treatment on the basis of either his position or his gender. The fact that a high seniority male was allowed to transfer from mid-night shift to yellow shift due to further fluctuations in the allocation of manpower does not undermine this Court's confidence that gender considerations played no role in this decision.
The case of Elizabeth Howard merits little discussion. It is abundantly clear that Ms. Howard experienced extensive difficulties in adapting to the demands of PQA and that her treatment by Company officials neither created nor contributed to her problem. Indeed, Company officials went to great lengths to accommodate Ms. Howard's particular needs and to this day the Company tolerates her shortcomings. The treatment of Elizabeth Howard does not suggest a discriminatory attitude.
Loretta Weiner's experience in finish pack is more unfortunate. However, this Court does not conclude that considerations of gender played a role in her being forced to "share" her permanent position with George Horniker. Rather, this Court concludes that Weiner was a casualty of the seniority system. Weiner was the lowest seniority lab tech assigned to finish pack and was informed of this fact when she accepted the "permanent" position. While this Court may consider the Area Coordinator's decision to displace and offend an admittedly excellent worker unwise and, perhaps, unfair, the Court does not conclude from the evidence that the Coordinator would have acted differently had Weiner been a man.

A. The Protected Group.

All plaintiffs allege that the operation of the Protected Group constituted sex discrimination. The Company argues that the Protected Group was not specifically mentioned in plaintiffs' charges of discrimination and that plaintiffs' claims are untimely because they were filed more than 300 days after the formation of the Protected Group. Plaintiffs respond that their allegations regarding the Protected Group are "like or related" to the claims outlined in their charges and that the existence of the Protected Group constituted a "continuing violation of Title VII". In the alternative, they suggest that the existence of the Protected Group can be considered as evidence of discrimination.
*1485 This Court agrees that plaintiffs' claims regarding the Protected Group are like or related to plaintiffs' other claims in their charges of discrimination. Plaintiffs complain that men receive more favorable assignments and allege that the Protected Group served to ensure that men received the most favorable assignments. Furthermore, Plaintiff Long specifically refers to the Protected Group in her charge of discrimination, and Cobb, Weiner and Landzettel all refer to "protective jobs" in their charges. With respect to the timeliness of plaintiffs' filings, this Court need not decide whether the operation of the Protected Group constituted a continuing violation of Title VII, because the Court finds that the formation and operation of the Protected Group did not constitute sex discrimination.
Plaintiffs have failed to persuade this Court that the Protected Group was formed for any purpose other than to keep the more experienced "old timers" out of Reprocessing. Thus, both male and female lab techs with lower seniority were disadvantaged in job assignment when the Protected Group was in operation. Indeed, both males and females signed a petition to abolish the Protected Group and participated in the various Union meetings seeking to achieve the same. Furthermore, that the Protected Group ultimately failed to achieve the purposes for which it was formed does not convince this Court that it was actually formed to keep women in Reprocessing. Rather, it was the stubborn adherence of Union and Company officials to plant seniority rather than departmental seniority that led to individuals with very little PQA experience being admitted to the Protected Group. Pat Long benefited from this practice when she was ultimately admitted to the Protected Group on the basis of plant seniority. Certainly if the Company and Union meant to keep women in Reprocessing, they failed miserably in their task when they allowed Long to enter the Protected Group. Thus, although the operation of the Protected Group proved to be somewhat anomalous, this Court nonetheless finds that it was not formed to discriminate against women.

B. Assignment Out of Reprocessing.

Plaintiffs claim that when men and women are assigned to Reprocessing, men are assigned out of Reprocessing to work "upper floor" jobs with greater frequency than women. The evidence clearly supports the Company's representation that lab techs are assigned to jobs within PQA on the basis of seniority and skill. Long, who has the greatest seniority and most extensive experience in PQA among the four plaintiffs, only spends a small fraction of her time in Reprocessing as compared to Weiner, Cobb and Landzettel. Furthermore, plaintiffs produced no evidence suggesting that they were assigned more frequently to Reprocessing than males of similar ability and seniority. Indeed, the evidence shows that Weiner, Cobb and Landzettel were, on the average, assigned to Reprocessing with the same frequency as Randy Fraley and Mike Bippen. Although Randy Fraley has the same seniority date as Cobb, Weiner and Landzettel, Mike Bippen has a slightly better seniority date than any of these four individuals.
Plaintiffs claim, however, that despite the fact that they are assigned to Reprocessing on par with men of similar seniority, they are assigned out of Reprocessing to openings on upper floors with less frequency than men. Plaintiffs have provided insufficient evidence to establish even a prima facie case of discrimination on this claim. Plaintiffs have produced no records indicating that their allegations are true. Company supervisors consistently state that when making assignments to upper floor jobs, they choose the most senior person on their list, and if that individual is familiar with the job, she is assigned to the upper floors. Furthermore, this Court has found that the facts show that a lab tech's inability to perform the PCAS and SVK tasks will not significantly affect the frequency with which she is assigned out of Reprocessing, as the need for "fill-ins" on such jobs occurs very infrequently.

C. Training.

Plaintiffs Cobb and Landzettel allege that they have been discriminated against *1486 on the basis of sex with respect to training on PCAS and SVK. The Company argues that Cobb and Landzettel are precluded from raising the issue of training because they did not specifically mention training in their charges of discrimination. The Court finds, however, that plaintiffs' allegations regarding training are like or related to the other allegations in plaintiffs' EEOC filings. Plaintiffs' charges allege that men receive the more favorable assignments in PQA. PCAS and SVK are considered favorable assignments. If plaintiffs have not been trained on PCAS and SVK they are precluded from receiving these favorable assignments.
No question exists that Cobb and Landzettel have been treated differently with respect to training. Landzettel was not trained on SVK for an extensive period of time and is still not trained on PCAS. Cobb is trained on neither SVK nor PCAS. Training within the department, however, varies widely with respect to all individuals, whether they are male or female. This is, in large part, due to the more subjective criteria for training on PCAS and SVK. The use of subjective criteria in employment decisions, however, does not alone make out a pattern or practice of discrimination. Burrows v. Chemed Corp., 567 F.Supp. 978, 985 (E.D.Mo.1983).
This Court concludes that plaintiffs' lack of training is due to their low plant seniority, their respective work and absentee records and the scarcity of funds to train, which necessitates that the Company only train the most capable and dependable workers on PCAS and SVK. One need not compare Cobb and Weiner to every worker on the PQA red shift to observe a correlation between seniority, ability, work record and training. Rather, comparing the four plaintiffs in the case at bar provides the most telling illustration. Among these four women, there exist four very distinct levels of training. Pat Long has high seniority and a work record that is virtually spotless; she is trained in every aspect of PQA. Loretta Weiner has low seniority, but has an excellent work record and took the initiative to be trained on SVK and PCAS by working overtime. She is trained in all areas except the specialty labs. Linda Landzettel has low seniority and a spotty work record, which has improved in recent years; she was recently trained on SVK, but has not been trained on PCAS. Curtiss Cobb has low seniority, and an extremely poor work record indicating lack of reliability and inability to work independently; she is trained on neither SVK nor PCAS. The different levels of training between these four women indicates that seniority and ability and dependability are indeed the criteria that the Company employs in making training decisions. This Court finds that no relationship exists between the gender of Cobb and Landzettel and their lack of training on SVK and PCAS.

D. Assignment to Tower Lab, Material Testing and Technical Services.

Plaintiffs allege that they have been excluded from the various specialty labs in PQA due to their sex. Although no woman has ever been assigned to Technical Services or Material Testing, plaintiff Landzettel has failed to show that she ever applied for or expressed an interest in these labs. Rather, the evidence shows that Linda Landzettel specifically indicated in June of 1984 that she did not desire to transfer to either Material Testing or the Tower Lab. Thus, Landzettel has failed to establish a prima facie case of discrimination with respect to these labs. Furthermore, the evidence shows that assignments to Material Testing and Technical Services are based on plant seniority. In addition, it is undisputed that all of the male lab techs assigned to Material Testing and Technical Services have earlier seniority dates than any plaintiff. Although males were transferred to Material Testing after Pat Long expressed her interest and submitted a transfer slip, none of these individuals had less seniority than Long. Therefore, this Court concludes assignments to these labs are, in fact, made on the basis of plant seniority and that no discrimination occurred with respect plaintiffs' assignment to Technical Services or Material Testing.
*1487 The evidence shows that, except on one occasion, assignments have to the Tower Lab have always been made according to plant seniority. The single exception occurred in 1979 when Mike Miskov and William Brawley, who both have less plant seniority than Long, were assigned as vacation relief to the Tower Lab. At this time Mel Klock was the General Foreman of Packaging and was encountering great difficulty in locating individuals who were interested in the Tower Lab. The sign-up sheet system for expressing an interest in the Tower Lab, however, had not yet been instituted. Rather, Klock relied upon word-of-mouth solicitation by delegates. Long suggests that because she indicated her interest to Klock and a delegate before Miskov and Brawley were assigned to the Tower Lab, and that because Miskov and Brawley were assigned to the Tower Lab before her, despite this expression of interest, then she was not chosen because of her gender. Other factors, however, persuade this Court that gender was not a factor in Klock's decision.
Klock testified that he did not know of any lab techs other than Brawley who were interested in the Tower Lab. In fact, because of a shortage of interested lab techs, he ultimately forced the individual who had been in PQA the for the shortest time, Mike Miskov, to go to the Tower Lab against his will. This Court cannot conclude from the evidence that Mel Klock was so set against placing a woman in the Tower Lab that he would force a male to go to the Tower Lab against his will. Furthermore, plaintiff Long was unable to pinpoint the exact time when she spoke to Mel Klock and the delegate other than to say it was around the time that she was a lead person. This could have been in the summer of 1978 or in the summer of 1979. Miskov and Brawley were first assigned to the Tower Lab in January of 1979. Thus, it is not clear that Long expressed her interest in the Tower Lab to either Klock or the delegate before Miskov and Brawley were initially assigned to the Tower Lab.[7] Finally, the Court notes that from 1979 through 1980, Long's absences correspond very closely to Brawley's assignments to the Tower Lab, which suggests that Klock may not have considered Long for the Tower Lab because she was not present when the opening arose. Indeed, on January 1, 1979, the date of Brawley and Miskov's initial assignment to the Tower Lab, Long was not present and would not be present for another two weeks. Based upon these considerations, this Court concludes that Pat Long was not discriminated against in assignments to the Tower Lab on the basis of sex in January of 1979 or at any later date.
This Court further concludes that neither Cobb, Weiner, nor Landzettel have been discriminated against on the basis of sex with regard to assignments to the Tower Lab. Unlike Pat Long, these plaintiffs did not have better seniority dates than either Miskov or Brawley. Thus, the assignment of Miskov and Brawley to the Tower Lab did not represent a departure from the seniority system with respect to these plaintiffs. It is true that plaintiffs received rather vague answers at times in response to their questions regarding the system for assigning lab techs to the Tower Lab. Such answers, however, reflect the rather disjointed and informal system that was in effect before Joe Schiro instituted the sign-up sheet system. Furthermore, Linda Landzettel was approached by a delegate who suggested that she consider working in the Tower Lab. The fact that the delegate broached the subject of the Tower Lab with Landzettel supports the idea that Klock was, in fact, having difficulty finding lab techs to work in the Tower Lab and that they did not seek to discourage women from applying to or working in the Tower Lab.[8]

*1488 E. Overtime Solicitation.

Plaintiffs allege that they were discriminated against on the basis of sex with respect to the solicitation of overtime. Plaintiffs' allege discrimination in two respects: (1) men received the more favorable jobs within PQA when overtime was assigned, leaving women with reproduction jobs; and (2) delegates who solicited overtime performed special "favors" for men, i.e., allowed men to work early on Fridays and still work overtime on Saturdays; called men at home to see if they wanted to work overtime. The Company argues that no mention of overtime solicitation was made in plaintiffs' EEOC charges and that plaintiffs allege improprieties on the part of Union delegates, whose conduct is not chargeable to the Company. The Court will discuss separately plaintiffs' allegations regarding job assignment on overtime and overtime improprieties.

1. Overtime Improprieties.

The Court agrees that plaintiffs' allegations with regard to delegates providing special favors to men with regard to overtime are not like or related to the allegations in plaintiffs' charges of discrimination. Therefore, this Court lacks jurisdiction to entertain this facet of plaintiffs' claims regarding overtime. Furthermore, even if plaintiffs' claims with respect to overtime abuses could be considered by this Court, the Court would find that plaintiffs have failed to present sufficient facts to suggest that such "favors" are granted on a regular basis. Plaintiffs' claims with regard to men leaving early on Fridays are based purely upon rumor, suspicion and speculation. The only "incident" that Landzettel observed occurred on a Thursday, rather than a Friday, which would involve no impropriety. Long claims that she overheard men talking about going fishing on a Friday and that she saw them working the following Saturday. She did not indicate, however, that she knew that the men were talking about going fishing that afternoon or that they did, in fact, go fishing. Indeed, Weiner's testimony with respect to the "incident" she anticipated between Tom Bailey and Mike Bippen highlights the hazards of indulging such speculation and basing a decision on such tenuous evidence. Weiner went so far as to record in her notes an "incident" that ultimately proved to be completely innocent and devoid of any impropriety whatsoever. Furthermore, plaintiffs' speculation that men regularly leave early on Fridays and work on Saturdays is somewhat suspect in light of the fact that if men consistently left early they would be disciplined for absenteeism.
Plaintiffs' allegations with regard to delegates calling men at home are, likewise, unsupported by evidence. The sole evidence with respect to such practices was the testimony of Weiner regarding and incident with Paul Parker. On this occasion, however, Parker promised to extended a similar "favor" to Weiner in the future, and ultimately did so. The Court does not conclude from this single incident that supervisors and delegates regularly call men at home to solicit overtime.

2. Job Assignment With Respect to Overtime.

This Court finds that plaintiffs' claims with respect to overtime job assignment are like or related to their general allegations regarding job assignment. The Court need not determine whether the practices of Union delegates who solicit overtime are assignable to the Company, however, because plaintiffs have failed to establish by a preponderance of the evidence that men receive more favorable overtime assignments. The Court acknowledges that plaintiff Weiner has witnessed rather curious behavior by delegates soliciting overtime. Her experiences with Charlie Luck suggest that he was not to be *1489 trusted. Weiner, however, ultimately received her deserved assignment in these instances, albeit with some effort on her part. Furthermore, any opportunity for harassment and misrepresentations by delegates with respect to the availability of jobs was eliminated with the advent of computer sheets and the requirement that lab techs sign for their overtime hours.
The only other testimony with respect to allocation of jobs on overtime is that of plaintiff Long. Long complains that on occasion she has signed-up for a favorable overtime assignment and the Company has decided not to run the unit to which she was assigned. She also complains that after she has signed up for a job in Reprocessing, additional production lab jobs have become available, and she is not allowed to switch her assignment. With respect to Long's first complaint, it is not believable that the Company would shut down a production line for the sole purpose of depriving Long of the opportunity to work overtime on a favorable assignment. Furthermore, Long's complaint regarding the decision to add additional production lab jobs does not suggest discrimination. Witnesses for both plaintiffs and the Company consistently testified that production needs change frequently in PQA. The constant fluctuation in manpower needs is what causes lab techs who have originally been assigned to Reprocessing to be reassigned to upper floor jobs. It is quite understandable that overtime opportunities would similarly fluctuate. Furthermore, plaintiffs have failed to show by a preponderance of the evidence that male lab techs have been allowed to change their overtime assignments when more favorable overtime opportunities arise. Accordingly, the Court finds that plaintiffs have not been discriminated against with respect to the assignment of overtime opportunities.

F. Retaliation Claims.

42 U.S.C. § 2000e-3 provides in pertinent part:
It shall be an unlawful employment practice for an employer to discriminate against any of his employees ..., or for a labor organization to discriminate against any member thereof ..., because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge ... under this subchapter.
Allegations of retaliatory discrimination are considered to be "ancillary" to the allegations in an underlying EEOC charge. Gupta v. East Texas State University, 654 F.2d 411, 413 (5th Cir.1981). Therefore, when an initial charge has been filed with the EEOC, independent charges of discrimination need not be filed with respect to claims of retaliatory discrimination before a Court can entertain such claims. Gupta, 654 F.2d at 413. But see, Waiters v. Parsons, 729 F.2d 233 (3rd Cir.1984) (refusing to adopt such a "per se" rule). To establish a prima facie case of retaliatory discrimination a plaintiff must show: (1) she engaged in activity protected by Title VII; (2) an adverse employment action occurred; (3) a causal connection existed between participation in the protected activity and the adverse employment action. Wentz v. Maryland Casualty Co., 869 F.2d 1153, 1154-55 (8th Cir.1989); McDaniel v. Temple Independent School Dist., 770 F.2d 1340, 1346 (5th Cir.1985). Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to produce some legitimate nondiscriminatory reason for the adverse employment decision. McDaniel, 770 F.2d at 1346. If the employer satisfies this burden, the plaintiff must ultimately prove that the proffered reason is a pretext for retaliation. Id. Ultimately, a plaintiff must establish that the employer's retaliatory motive was a "but for" cause of the adverse employment decision. Wentz, 869 F.2d at 1155 (Wollman, J. concurring); Dominic v. Consolidated Edison Co., 822 F.2d 1249, 1260 (2d Cir.1987) (panel statement on rehearing).
A finding of unlawful retaliation, however, does not depend on the merits of the underlying discrimination complaint. Davis v. State University of New York, 802 F.2d 638 (2d Cir.1986). Furthermore, Title VII'S prohibition against retaliatory discrimination protects activities ranging from the filing of a formal complaint *1490 to expressing a belief that the employer has engaged in discriminatory practices. See, e.g., Wentz, 869 F.2d at 1153; Berg v. La Crosse Cooler Co., 612 F.2d 1041 (7th Cir.1980); Coleman v. Wayne State University, 664 F.Supp. 1082 (E.D.Mich.1987). A plaintiff need not establish that the conduct she opposed was in fact discriminatory, but, rather, must demonstrate a good faith reasonable belief that the underlying challenged action violated the law. Wentz, 869 F.2d at 1153.
With respect to a number of plaintiffs' claims, but particularly with respect to plaintiffs' retaliation claims, the issue of the witnesses' credibility is virtually dispositive of plaintiffs' claims. In determining credibility a Court should consider the relationship of the witnesses to the parties, the witnesses' interest in the outcome of the proceedings, the witnesses' demeanor while testifying, the witnesses' opportunity to observe and acquire knowledge of what they were testifying about, and the extent to which the testimony was supported or contradicted by other credible evidence. Morris v. American National Can Corp., 730 F.Supp. 1489, 1494 (E.D.Mo.1989); Perkins v. General Motors Corp., 709 F.Supp. 1487, 1499 (W.D.Mo.1989). In the case at bar plaintiff Weiner testified to a number of vindictive statements allegedly made by Company officials. Ms. Weiner relied heavily on the copious notes that she took regarding events at work after she filed her charge of discrimination. Indeed, at times she was unable to recall rather significant events and conversations without the aid of her notes. Yet, many of these alleged statements by Company officials did not appear in her notes, although she claimed to remember the exact words these officials used. In addition, Weiner was unable to place many of these statements within a specific time period or recall the particular conversational context. Furthermore, although Weiner's quotations did not actually conflict with the recollections of her co-plaintiffs as to what was said, neither were her recollections entirely consistent with those of Long, Cobb and Landzettel; and Weiner's version of what was said was inevitably more harsh. Based upon these factors and upon this Court's observation of Ms. Weiner's overall demeanor and her difficulty in constructing cogent and responsive answers to questions posed to her, this Court does not credit the testimony of Ms. Weiner with respect to statements of Company officials.

i. Retaliation Claims Common to all Plaintiffs.

Two allegations of retaliation are common to all plaintiffs: (1) the Company's removal of monthly job assignment sheets; and (2) the alleged refusal of shop stewards to sign and process grievances. With respect to the Company's removal of job assignment sheets, this Court concludes that this action was in no way taken in retaliation for plaintiffs' engaging in "protected activities." First, the Court notes that this change in posting job assignment sheets occurred before even plaintiff Long had filed her charge of discrimination. Although plaintiffs suggest that they complained to Union and Company officials about many of the practices that were ultimately the subject of this lawsuit, plaintiffs have presented insufficient evidence to suggest that said complaints were accusations of sex discrimination or that the Company could or should have known that plaintiffs were suggesting sex discrimination. Hence, plaintiffs have failed to establish any "causal connection" between the removal of the sheets and their participation in protected activity. Furthermore, even assuming that the Company understood plaintiffs' complaints to be suggestions of sex discrimination, the removal of job assignment sheets cannot possibly qualify as an "adverse employment action."
With respect to the alleged refusal of shop stewards to sign grievances, this Court likewise finds that no retaliatory discrimination occurred. The Union controls the realm of processing grievances. This Court, however, has previously dismissed all substantive claims against the Union. At no time did plaintiffs seek to amend their complaint to add new charges against the Union. Therefore, this claim of retaliation, which can only be against the Union, *1491 cannot be entertained. In addition, this Court notes that plaintiffs have failed to provide sufficient facts to support such a claim. The record is replete with instances where the Union intervened on plaintiffs' behalf both before and after plaintiffs filed charges with the EEOC. Indeed, plaintiffs' chief complaint seems to be that on occasion Union delegates and officials have requested that plaintiffs allow them to try to handle matters without the formal filing of a grievance. On many of these occasions, however, the Union has been quite successful in obtaining relief for plaintiffs without resorting to the grievance process.

ii. Long's Vacation and Loan Application.

Two of plaintiff Long's claims of retaliation, the September 1986 incident involving her vacation and the 1985 incident involving the mistake on her loan application, are particularly lacking in merit. Plaintiff presented absolutely no evidence that would lead this Court to believe that these incidents involved anything more than clerical errors. Furthermore, in both instances Company officials acted with reasonable dispatch to rectify the errors and were very helpful in trying to accommodate Long. This Court finds absolutely no indication that the Company retaliated against Pat Long with respect to these incidents.

iii. Retaliatory Harassment.

A number of plaintiffs' allegations of retaliation are, in effect, claims of harassment. All of the plaintiffs testified that Paul Parker was known to make remarks about "people who make waves". Pat Long complains of the argument she had with Tom Bailey, the pushing incident involving Otto Speringer, the posting of the cartoon in the Bevo building, the obscene comments scratched on the fork trucks, Tom Brawley's refusal to get Long lunch in the Tower Lab and the 1980 Seratti clipboard throwing incident. Loretta Weiner also complains of the obscene comments scratched on the fork trucks, as well as insulting remarks made by Skip Voight, and the yelling incident involving Ron Keller.
Although this Court is unaware of cases discussing an employer's liability under Title VII for harassing employees because they have engaged in Title VII protected activities, it is well established that racial or sexual harassment and a racially or sexually hostile work environment may violate Title VII if said harassment or hostility becomes sufficiently severe as to alter the conditions of employment. See Meritor Savings Bank v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); Minteer v. Auger, 844 F.2d 569, 570 (8th Cir. 1988); Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir.1981). Certainly harassment in retaliation for an employee's protected activities could constitute an "adverse employment action". Furthermore, harassment in retaliation for filing a charge of sex discrimination could be viewed as a form of sex discrimination. Accordingly, this Court will analyze plaintiffs' allegations of harassment according to the principles applied in cases involving sexual harassment.
For harassment to be actionable, it must be sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment. Vinson, 477 U.S. at 67, 106 S.Ct. at 2405. Conduct that has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment constitutes harassment. Id. at 65, 106 S.Ct. at 2404. To prevail on a hostile environment claim a plaintiff must establish: (1) she belongs to a group protected under Title VII; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her status as a member of said protected group; (4) the harassment affected a "term, condition, or privilege" of employment; (5) the employer knew or should have known of the harassment in question and failed to take proper remedial action. See generally, Staton v. Maries County, 868 F.2d 996, 998 (8th Cir.1989); Moylan v. Maries County, 792 F.2d 746, 750 (8th Cir.1986). In order for harassment to be "unwelcome", *1492 plaintiff must not have solicited or invited the harassment and must have regarded the conduct as undesirable or offensive. Moylan, 792 F.2d at 749. Furthermore, to establish that harassment was sufficiently pervasive a plaintiff cannot rely on a single or isolated incidents, but, rather, must show a practice or pattern of harassment against her. Id. at 750. Indeed, a plaintiff must show that the complained of conduct "poisoned" her work environment. Scott v. Sears, Roebuck, 798 F.2d 210, 214 (7th Cir.1986).
This Court concludes that the alleged incidents, individually or taken together, were not sufficiently severe or pervasive to alter the conditions of plaintiffs' employment, and they do not, therefore, qualify as "adverse employment actions". Furthermore, the Court finds that none of these actions was taken on the basis of sex or in retaliation for plaintiffs' protected activities.
With respect to several of the incidents that plaintiffs point to as examples of retaliatory harassment the Company took immediate and decisive action to correct the offending individual's behavior and indicated that such actions would not be tolerated. The Company took a very strong stand with regard to the Long cartoon incident and the comments scratched on fork trucks. It is difficult to imagine that the Company could have done more than it did on these occasions. That plaintiffs may not approve of the particular choice of language that the Company used in its memo warning against such behavior is of little importance. Similarly, the Company severely disciplined Skip Voight for the remark he allegedly made to Loretta Weiner, despite the fact that he insisted that he never made the statement. Plaintiffs have presented no evidence that incidents of this kind persisted after the Company intervened.
With respect to Long's complaints involving Tom Brawley in the Tower Lab, her argument with Tom Bailey, and the Seratti clipboard incident, Long specifically testified that she did not inform the Company of these matters. Indeed, Long testified that she considered the clipboard incident and the Bailey argument to be matters strictly between Union members and herself. Plaintiffs have presented no evidence that such incidents occurred with sufficient frequency to qualify as "pervasive" or to suggest that the Company should have known of such actions.[9]
With respect to the Speringer incident, this Court concludes that no retaliatory or discriminatory motive was involved and that it was an isolated incident. Long herself indicated to Joe Schiro that she did not know why Speringer had acted in the manner he did. Likewise, the incident involving Ron Keller's yelling at Loretta Weiner does not suggest retaliation or discrimination. It is not clear from the evidence that Keller was, in fact, angry with Weiner or that he yelled in anger. Furthermore, the fact that Keller was inclined to yell at both men and women suggests that no sexual or retaliatory motive affected his actions.
The remarks of Paul Parker fail in many respects to qualify as harassment or actionable retaliation. Plaintiffs have offered insufficient evidence to persuade this Court that Parker's remarks were either pervasive or offensive. Furthermore, the evidence does not suggest that Parker's grumblings were reserved exclusively for plaintiffs. Indeed, the record clearly reflects that Paul Parker treated everyone, both males and females, in the same manner: badly. Finally, it is not clear from the plaintiffs' testimony what Paul Parker meant by his "making waves" remarks. Certainly both Parker and Schiro consider the extensive friction on the red shift to be a problem. Parker identified several men on the shift who are considered to be malcontents. There is good cause to believe that anyone complaining or grieving, male or female, was "making waves" in Parker's lingo. Thus, given plaintiffs' inability to *1493 place many of Parker's remarks in their proper context, this Court is unable to conclude that his references to "people who make waves" were necessarily directed toward plaintiffs or that he was making reference to their protected activities.

iv. Unusual Demands and Intensified Scrutiny.

Plaintiffs also claim that Company officials retaliated against them by assigning them unusually onerous tasks and subjecting them to more intense scrutiny and undue criticism of their work performance. Long complains of the incident where Tom Schinsky assigned her multiple tasks, Paul Parker "peeking" around corners while she worked, Paul Parker criticizing her for writing "no time" on a lab report, the incident involving Paul Parker where Long took beer on a flatbed to the Tower Lab and Lydia Stewart's assignment of Long to "spin glass" when Long was excused from such duties. Weiner complains of the incident involving layer random sampling where she objected to Ron Keller that the procedure was dangerous.
The Court finds that the Company has provided valid, nonpretextual explanations for all of these incidents and that no discriminatory or retaliatory motive was involved. The incidents involving Long and Tom Schinsky and Weiner and Ron Keller were certainly unexceptional applications of what those supervisors understood to be standard operating procedure. Schinsky did not even know of Long's charge of discrimination when he assigned her multiple tasks. Likewise, the evidence suggests that Parker criticized Long in the same manner he had criticized other lab techs. In addition, the Court is not persuaded by Long's testimony that Parker was ever "spying" on her or that he was subjecting her to more intense scrutiny than other employees.[10] With respect to the incident involving Parker and the flatbed, the Court finds no evidence suggesting that the consistent and plausible explanations of Parker and Joe Schiro should be disbelieved. With respect to the Lydia Stewart incident, this Court likewise finds no evidence of discrimination or retaliation. Rather, the entire incident between Long and Stewart clearly resulted from a power struggle between these two women.

v. Reprimands and Disciplinary Actions.

The remainder of incidents that plaintiffs point to as acts of retaliation involve the application of Company rules to plaintiffs and reprimands or disciplinary actions against plaintiffs for violations of such rules. Long complains of the application of the no-smoking rule to her in January of 1984, Tom Schinsky's application of the no-eating rule to her in August of 1989 and Don Kuegler's refusal to allow Long to take a "short-cut" to draft beer. Weiner and Cobb complain of the July 1987 charge by John Dempsey that they were missing from the work place. Cobb and Weiner also complain of Paul Parker's refusal to allow them to leave early to get lunch. Landzettel complains of her suspension for fighting with Carolyn Ray.
Again, the Court concludes that in each of these incidents the Company's rules were applied fairly and equally between plaintiffs and other workers without regard to gender or the fact that plaintiffs had engaged in protected activity. The smoking incident occurred before Long had even filed a charge of discrimination. In addition, the Company made an exception in favor of Long on this occasion by allowing her to smoke. Don Kuegler instructed Long to follow a procedure when travelling to draft beer that he wanted all lab techs to observe. Tom Schinsky strictly enforces the no-eating rule whenever he is in charge. Furthermore, he counseled Pat Long because he caught her eating the very next day after he had warned her about eating, not because of any retaliatory or discriminatory motive. Cobb and Weiner failed to present credible evidence showing that Parker allows other employees to leave the work place early when they *1494 fail to bring their lunch. Furthermore, on the occasion that Cobb and Weiner complain of, Parker provided a lunch runner to get their lunch for them.
Likewise, the Court finds Linda Landzettel was not suspended for fighting because she engaged in protected activity. She received the same punishment as Carolyn Ray, who had filed no charge of discrimination, and these women were treated no more harshly than a number of other employees who engaged in fights at work. Indeed, all workers had been warned as early as September of 1987 that fighting could be met with discharge. Ultimately, Landzettel and Ray received a much less harsh discipline than discharge. The incident of Jim Guttman cutting off Fred Tuhro's ponytail was unique unto itself and deserving of different treatment. Although the Guttman/Tuhro incident displayed the potential to escalate into a very serious matter, it apparently never reached the point of fisticuffs or even an actual confrontation.
With respect to the Cobb and Weiner incident, Paul Parker's remark about "people who make waves" is of little significance. Parker participated in the search for Cobb and Weiner and was present when they were questioned. It was John Dempsey, however, who pursued the matter and Joe Schiro who made the ultimate decision as to whether discipline was warranted. There is no indication that either Schiro or Dempsey sought to retaliate against Cobb and Weiner. Dempsey did not know of Cobb and Weiner's protected activity until the decision to pursue the matter was made, and Schiro took great care in making sure that he understood the facts correctly because of Cobb and Weiner's pending EEOC charges. In addition, it is clear that Cobb and Weiner were missing for an inordinate period of time, and that their explanations were dubious. In sum, this Court finds that no retaliatory discrimination occurred with respect to any plaintiff.

CONCLUSION
After listening to the testimony in this case and thereafter reviewing all the evidence and the briefs, this Court has become intimately familiar with almost every slight that occurred on the PQA red shift at Anheuser-Busch over the past decade. The courtroom has served as a forum for cataloguing many gripes, complaints and petulant behavior which have nothing to do with sex discrimination. With respect to plaintiffs' claims of retaliation, plaintiffs have made such an effort to detect any evidence that the Company was "lying in wait" for them that at times it seems the reverse may have been true. It is apparent that the red shift is the repository of more than a few malcontents (including both males and females). Obviously, a course in manners or in Vanderbilt's rules of social etiquette is not a prerequisite for working as a beer bottler at Anheuser-Busch.
Despite the rather fractious world of the red shift, plaintiffs Long and Weiner in particular have managed to command the respect of their supervisors and many of their co-workers and have performed well in an environment that is not for the mild or the meek.
The testimony and evidence in this case indicates that a good deal of the conflict between plaintiffs, the Company and the Union, indeed, much of the conflict on the red shift, has arisen due to disagreements among these factions as to how various tasks would be best assigned and accomplished. On more than one occasion plaintiffs testified that "Paul Parker had to have things `his way'". In a similar vein, supervisor Lydia Stewart announced that "Pat Long isn't going to tell me how to run my shift!" On occasion plaintiffs have opposed what they perceived to be an unwise or unfair practice, and their viewpoints have prevailed. On other occasions their suggestions and complaints have fallen on deaf ears.
The purpose of Title VII and the charge of this Court, however, is not to eradicate every unfair or unwise practice at Anheuser-Busch. The fact that a particular practice is unfair or that it is somewhat lacking in logic does not, in and of itself, make the practice discriminatory within the meaning *1495 of Title VII. Rather, the purpose of Title VII is to ensure that a particular practice does not bear the slightest taint of discrimination or, if it does, to take steps to remedy such practice. Clearly, at times, some practices of both the Union and Company seem unwise and silly. Most of these practices, no doubt, have arisen more from tradition than from reason. It is not this Court's duty, however, nor is this Court qualified, to assure an industrial Utopia in the Bevo Plant wherein every policy and practice displays perfect logic and every worker is considerate, conscientious and industrious. Nor is it proper for this Court to prohibit Anheuser-Busch from engaging in any practice because the Court deems it to be ill-advised. Rather, this Court is charged with the responsibility to assure that women, and especially these plaintiffs, have not been treated unfairly or differently because of their gender or participation in activities protected by Title VII. This Court concludes that no such discrimination has occurred. Accordingly, judgment will be entered in favor of the defendants.
NOTES
[1] The parties only provided job assignment information for January of 1984 through October 15, 1984.
[2] The parties only provided job assignment information from June of 1985 through December of 1985.
[3] Through July of 1988.
[4] The position of "lead person" was subsequently eliminated.
[5] "Disparate Treatment" occurs when an employer treats some people less favorably than others because of their race, color, religion, sex, or national origin. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).
[6] "Disparate impact" claims are different from disparate treatment claims in that the former involve facially neutral employment practices that fall more harshly on one group than another and cannot be justified by business necessity. Proof of discriminatory motive is not required under a disparate impact theory. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15.
[7] Indeed, that Long did not challenge the Brawley assignment until 1982 suggests that for a long time she either did not know of the assignment, or did not care.
[8] It is somewhat curious that Linda Landzettel found her name scratched out on the Tower Lab replacement list in favor of Mike Miskov. This fact does cause the Court some pause with regard to Mel Klock's representation that he knew of no lab tech who entered PQA before Mike Miskov that wanted to go to the Tower Lab. There are, however, a myriad of possible explanations for who put Landzettel's name on the list and why it was scratched out. The fact that the entire PQA department was in a state of disarray at the time suggests that the actual reason might not have been the result of careful reasoning. Nevertheless, taking all the facts into consideration, this Court is persuaded that the reason was not based on Landzettel's gender.
[9] With respect to the Brawley incident in the Tower Lab, Long's own testimony suggests that the lab techs in the Tower Lab have treated her very well. Long testified that the lab techs in the Tower Lab like her and that they often allow her to work in an area where her particular physical problems will not be aggravated by tasks such as hauling beer.
[10] With respect to these allegations regarding Parker, the Court further concludes that even if such actions occurred, they would not qualify as "adverse employment actions".